ARGUED AND DETERMINED IN THE

# SUPREME COURT

OF THE

## STATE OF WISCONSIN,

### AT THE JUNE TERM, A. D. 1854.

*In the matter of the petition of* SHERMAN M. BOOTH, *for a Writ of Habeas Corpus, and to be discharged from imprisonment.*

CERTIORARI TO ASSOCIATE JUSTICE A. D. SMITH, OF THE SUPREME COURT.

A writ of certiorari lies to one of the justices of this court, to review judicial acts done by him in vacation.

Upon proper application, a writ of Habeas Corpus may be allowed, heard and determined by a justice of this court in vacation, in conformity with the statute.

This *court* has jurisdiction of the common law writ of Habeas Corpus, and to hear and determine the same, conferred upon it by the Constitution of the State, independent of any legislative action in reference thereto.

The writ of Habeas Corpus may be directed to any person or officer within this State ; and such person or officer is bound, upon due service thereof, to make return thereto, and upon failure so to do, such return will be enforced.

Upon such return, the court or magistrate before whom the case is heard, may enquire into the nature and validity of the process, if any, by which the de-

2

JUNE TERM
1854.

In re
Sherman M
Booth.

tention of the prisoner is sought to be justified, by whatsoever authority the same may have been issued.

If, upon enquiry into the nature and cause of the caption and detention of the prisoner, it shall be found that he is held by virtue of process issued by a court or judge of the United States, having exclusive jurisdiction of the subject matter of the process, the prisoner must be remanded, and this as well by the comity of courts as by the provisions of the statute.

The warrant set forth in the return to this writ of certiorari, is not sufficient to justify the detention of the prisoner.

The order of discharge set forth in the return to this writ of certiorari was properly made.

The act of Congress of 1850, commonly called the Fugitive Slave Act, is unconstitutional and void.

    1. Because it does not provide for a trial by jury of the fact that the alleged fugitive owes service to the claimant by the laws of another State, and of his escape therefrom.

    2. It authorizes a hearing and determination of the claim of the master, and the fact of escape, by commissioners of the United States, who cannot be endowed with judicial powers under the Constitution of the United States.

    3. The judicial power of the United States can be vested only in *courts*, or in *judges*, whose term of office is during good behaviour, and whose compensation is fixed and certain.

    4. The functions with which United States commissioners are endowed by the act of 1850 are judicial, and therefore repugnant to the Constitution.

    5. By the said act, any person alleged to be a fugitive may be arrested and deprived of his liberty *"without due process of law."* CRAWFORD, J., *dissenting.*

The act of Congress of 1850, commonly called the Fugitive Slave Act, in relation to fugitives from service or labor, is unconstitutional and void; because Congress has no constitutional power to legislate upon that subject. *Per* SMITH, J.

On the 27th day of May, A. D. 1854, in vacation, the petitioner, Sherman M. Booth, made application to Mr. Justice Smith, of the Supreme Court, for a writ of Habeas Corpus, and to be discharged from imprisonment, which application was based upon the following petition, and the document annexed :

Sherman M. Booth respectfully represents to the Hon. Abram D. Smith, one of the justices of the Supreme Court of said State, that he, the said Sherman M. Booth, is restrained of his liberty by one Stephen V. R. Ableman, the marshal of the United States for the District of Wisconsin, and that said restraint is in

the city and county of Milwaukee, and that the said

Booth is not committed or detained by virtue of the final judgment or decree of any competent tribunal of civil or criminal jurisdiction, or by virtue of any process, judgment or decree, or execution, prescribed in section 2, of chapter 124, of the Revised Statutes of said State; but that the cause and pretence of said restraint are, to the best of the knowledge and belief of the said Booth, by virtue of a pretended warrant, a copy of which is hereto annexed, and for the reasons in said warrant set forth.

And the said Booth alleges that the restraint of his liberty is illegal, for the reason that the said act of Congress referred to in the said warrant, approved September 18th, A D. 1850, is unconstitutional and void.

Also, for the reason that the Congress of the United States has no constitutional power or authority to punish the offence with which said Booth is charged, and for which he is detained by said warrant; for which reasons said warrant is of no force or validity whatever.

And the said Booth further alleges, as a reason for the illegality of said imprisonment, that the said act of Congress is in violation of the compact, unalterable, except by common consent, contained in the ordinance of 1787, for the government of the Territory northwest of the Ohio river, and that therefore said act is not in force in said State.

And also the further reason, that it is alleged in said warrant, and also in the complaint on which the same is founded (all of which appears in said warrant), that the said Joshua Glover was "the property" of the said Benammi S. Garland; whereas, the

June Term
1854.

In re.
Sherman M
Booth.

act of Congress under which said complaint was made, punishes the aiding, &c., in the escape of "persons held to service or labor under the laws," &c., and not the aiding in the escape of " property ;" for which reason said warrant is defective in substance and form.

Therefore, the said Booth prays that a writ of Habeas Corpus may be issued in his favor, directed to the said Stephen V. R. Ableman, and commanding him to bring the said Booth before your Honor, to be dealt with according to law.

Subscribed and sworn, &c.

"*United States of America, District of Wisconsin, ss:*

The President of the United States of America to the Marshal of the District of Wisconsin, and the keeper of the common jail in Milwaukee county, in the District aforesaid, *Greeting :*

Whereas, Sherman M. Booth has been brought before me, a commissioner duly appointed by the District Court of the United States for said District, under and by virtue of the several acts of Congress, charged on oath with having, on the 11th day of March, eighteen hundred and fifty-four, at the city of Milwaukee, in the county of Milwaukee, in said county and district, unlawfully aided, assisted and abetted a person named Joshua Glover, held to service or labor in the State of Missouri, under the laws thereof, and being the property of one Benammi S. Garland, and having escaped therefrom into the State of Wisconsin, to escape from the lawful custody of Charles C. Cotton, a deputy of the marshal of the United States for the district of Wisconsin, the said Charles C. Cotton having then and there arrested and taken into custody the said Joshua Glover, by virtue of a warrant issued by the judge of the United States for the said dis-

trict, pursuant to the provisions of the act of Congress in that case made and provided, approved September 18th, 1850. And whereas, an examination was, in the month of March aforesaid, held before me, and I, the said commissioner, being satisfied that an offence had been committed, as charged in said complaint, and that there was probable cause to believe the said Sherman M. Booth guilty thereof, did thereupon require the said Sherman M. Booth to recognize with sufficient sureties, in the sum of two thousand dollars, for his appearance before the said District Court, on the first day of the next stated term thereof, to be held on the first Monday of July next, at Madison, in said District, and that he would not depart from said court without leave. And whereas, the said Sherman M. Booth did accordingly so recognize as required, and has now this day been arrested by Charles E. Wunderly, his bail or surety in such recognizance, and delivered to the marshal of said district, before me, the said commissioner; and whereas, the said bail or surety has requested me to re-commit the said Sherman M. Booth to the custody of the said marshal; and whereas, the said Sherman M. Booth has failed again to recognize, as so required by me; now therefore, you, the said marshal, are hereby commanded forthwith to convey and deliver into the custody of the keeper of the said common jail, the body of the said Sherman M. Booth; and you, the said keeper of the said common jail, are hereby commanded and required to receive the said Sherman M. Booth into your custody in the said jail, and him there safely keep, until he shall be discharged by due course of law.

Given under my hand, at the city of Milwaukee, in

June Term 1854.

In re Sherman M Booth.

said District, this 26th day of May, eighteen hundred and fifty-four.                         WINFIELD SMITH,

                                    *Commission r, &c.*"

Upon this petition a writ of Habeas Corpus was allowed, and issued on the same day, and the respondent, Stephen V. R. Ableman, Esq., United States Marshal for the District of Wisconsin, on the same day made return to said writ, with the body of the petitioner, before the said justice, with the day and cause of his caption and detention, viz: That he received the said Booth into his custody on the 26th day of May, A. D. 1854, as marshal of the United States for the said District of Wisconsin, and had since held and still do's h ld him in custody, by virtue of a warrant of commitment issued by Winfield Smith, a commissioner duly appointed by the District Court of the United States for said District; a copy of which was appended to the return, which was the same as that of the warrant annexed to the petition.

The district attorney of the United States having been duly notified of the application, appeared; the return of the marshal was demurred to, and by consent the hearing was postponed until the 29th day of May, and in the meantime the petitioner was placed in custody of the marshal.

On the 29th and 30th of May, the case came on to be heard upon the return of the marshal and the demurrer thereto, and was argued by Byron Paine, Esq., for the petitioner, and by J. R. Sharpstein, Esq., in behalf of the marshal. The case was held under advisement until the 7th day of June, 1854, when the petitioner was discharged by order of the justice, and the following opinion then delivered:

SMITH, J. On the 27th ult. application was made to me by Sherman M. Booth, the petitioner, for a writ of Habeas Corpus, to be directed to Stephen V. R. Able- man, who, it was alleged, restrained the petitioner of his liberty. Accompanying the petition was a copy of the process, by virtue of which, it was alleged, the petitioner was held in custody. This writ purported to be what is commonly called a *Mittimus*, issued by Winfield Smith, Esq., " a commissioner duly appointed by the District Court of the United States for said district, (District of Wisconsin,) under and by virtue of the several acts of Congress;" and recited that the petitioner was " charged on oath with having, on the 11th day of March, 1854, at the city of Milwaukee, in said county and district, unlawfully aided, assisted and abetted a person named Joshua Glover, held to service or labor in the State of Missouri, under the laws thereof, and being the property of one Benammi S. Garland, and having escaped therefrom into the State of Wisconsin, to escape from the lawful custody of Charles C. Cotton, a deputy of the marshal of the United States for said district, pursuant to the provisions of the act of Congress in that case made and provided, approved September 18th, 1850," &c. The writ goes on to recite an examination before the commissioner, its result in holding the petitioner to bail, the giving of the required bail, his subsequent arrest and surrender by his bail, the order of the commissioner to enter into recognizance again, his neglect and refusal so to do, and hence the issuing of the writ; and closes with the following command : " Now therefore, you the said Marshal, are hereby commanded forthwith to convey and deliver into the custody of the keeper of the said common jail, the

body of the said Sherman M. Booth, and you the said keeper of the said common jail are hereby commanded and required to receive the said Sherman M. Booth into your custody in the said jail, and him there safely keep, until he shall be discharged by due course of law."

In his application or petition, the petitioner alleges the illegality of his imprisonment to consist in the following, viz: That the act of Congress referred to in the said warrant, is unconstitutional and void; also that Congress has no constitutional power or authority to punish the offence with which said Booth is charged and for which he is detained; that the act of Congress of 1850, is in violation of the provisions of compact, unalterable, except by common consent, contained in the ordinance of 1787, for the government of the Territory north-west of the Ohio river, and that therefore said act is not in force in said State: "And also that it is alleged in said warrant and also in the complaint on which the same was founded, (all of which appears by said warrant,) that the said Joshua Glover was the property of the said Benammi S. Garland, whereas the said act of Congress under which said complaint was made, punishes the aiding, etc., in the escape of ' persons held to service or labor under the laws,' etc., and not the aiding the escape of ' property,' for which reason said warrant is defective in substance and form."

Upon this application I could not hesitate to issue the writ according to the prayer of the petition. I had hoped, indeed, that, inasmuch as at least two opportunities had been presented to the petitioner, since his original arrest, to apply to the Supreme Court in term time for this writ, that he would have done so,

had he been disposed to avail himself of its instru-

mentality. The court was in session at the time of his arrest, and an adjourned session was held, commencing the 15th day of May, at either of which times the petitioner might have presented his application, and obtained the opinion and judgment of the whole court; and I am at a loss to conceive the motive which may have induced him or his advisers to forego such opportunities. But I have no right to complain that any citizen calls upon me for the discharge of any duty pertaining to my office. I do not complain. Yet I cannot but feel the immense responsibility thrown upon me alone, and may be pardoned for expressing my regret that I am deprived of the aid and counsel of my associates, so much better able to cope with the grave and intricate questions involved, than I am myself. Whether by design, or from necessity, this application has been made to me, I meet the emergency with all the anxiety and concern which it cannot fail to excite, and, I hope, with some share of the firmness which the occasion and the nature of the questions involved imperatively demand.

There was no question pertaining to the subject matter of the application, nor connected with the parties, which approached, in the slightest degree, to a conflict of jurisdiction between the State and Federal courts, or the judges thereof. The warrant, by virtue of which the petitioner was held, was not issued by a federal judge or court, but by a commissioner of the United States. No exclusive or ultimate jurisdiction can be claimed for an officer of this kind. As one of the Justices of the highest judicial tribunal of this State, which tribunal represents in that behalf the sovereignty of the State, I could not deny to any citi-

June Term
1854.

In re
Sherman M
Booth.
zen or person entitled to the protection of the State, the proper process by which the validity of a warrant issued by such authority, could be examined. Nor can I admit, that a court commissioner, holding his appointment at the will of the court, responsible only to such court—in fact, irresponsible and unimpeachable—has the right or the power, or can have the right or the power, to issue any process by which a citizen of the State may be imprisoned, that may not be examined, and its validity tested, by the proper judicial authority of the State. Indeed, we may go farther, and say, that as every citizen has a right to call upon the State authority for protection, and as the judicial power is that only to which application can usually be made by the citizen, it is the duty of the judicial officer, when applied to, to see that no citizen is imprisoned within the limits of the State, nor taken beyond its limits, except by proper legal and constitutional authority. It is not in the power of any body to divest the State judiciary of such authority, nor can any body, but the people themselves, absolve the judicial officers of the State from the performance of their duty in this behalf.

It is not necessary here to inquire what would be the force and effect of a warrant like the present one, were it issued by a judicial officer of the United States. I confess, however, that I have never been able to appreciate the liability to, or danger of, or necessity for, collision between the judicial and ministerial authority of the States and the United States.

The line of demarkation is not very dim, and a proper regard to the peculiar functions of each class of officers, will render all apprehension on that score a work of supererogation. But the States will never

June Term
1854.

In re
Sherman M
Booth.

submit to the assumption, that United States commissioners have the power to hear and determine upon the rights and liberties of their citizens, and issue process to enforce their adjudications, which is beyond the examination or review of the State judiciary. They will cheerfully submit to the exercise of all power and authority by the federal judiciary, which is delegated to that department by the federal Constitution; but they have a right to insist, and they will insist, that the State judiciary shall be and remain supreme in all else, and that the functions of the federal judiciary within the territory of the States shall be exercised by the officers designated or provided for by the Constitution of the United States, and that they shall not be transferred to subordinate and irresponsible functionaries, holding their office at the will of the federal courts, doing their duty and obeying their mandates, for which neither the one nor the other is responsible.

Every jot and tittle of power delegated to the federal government will be acquiesced in, but every jot and tittle of power reserved to the States will be rigidly asserted, and as rigidly sustained.

It is only by exacting of the federal government a rigid conformity to the prescribed limitation of its powers, and by the assertion and exercise on the part of the States of all the powers reserved to them, and a due regard by both to their just and legitimate sphere, that obedience can be rightfully exacted of the citizen, to the authority of either.

Entertaining the opinion that a commissioner of the United States has no rightful authority to imprison a citizen of this State, or any other person entitled to the protection of its laws, by any process which pre-

June Term
1854.

In re
Sherman M
Booth. cluded the State authority from inquiring into the proceedings of such commissioner, and on inspection of the writ, a copy of which was presented with the petition, I could not deny the writ of Habeas Corpus prayed for.

The marshal to whom the writ was directed, in conformity with the double allegiance which we all owe to the State and to the United States, promptly made return, bringing the body of the petitioner before me, and showing as the cause of his caption and detention, a copy of the mittimus hereinbefore mentioned and set forth.

The petitioner demurred to the return of the marshal, and thus the whole question of the legality of the commissioner's process, both in respect to its form and substance, and the validity of the law of Congress, for the alleged violation of which the petitioner was arrested, is fairly and fully presented.

The petitioner demands his discharge from imprisonment on two grounds:

1st. Because the law of Congress, approved the 18th of September, 1850, in relation to the extradition of fugitives from service or labor, is unconstitutional; and 2d, because the writ is defective.

Had the determination of this matter been placed upon the insufficiency of the writ alone, I should have had but little difficulty in arriving at a conclusion; because I entertain no doubt, that the writ is so substantially defective, that the discharge of the petitioner must, for that cause alone, have been ordered. But the petitioner has, through his counsel, expressed his desire to waive all objections to the form or substance of the warrant, and to rest his case solely upon his objections to the constitutionality of the law in question.

The Constitution of the United States is the funda- June Term 1854.

In re Sherman M Booth. mental law of the land. It emanated from the very source of sovereignty as the same is recognized in this country. It is the work of our fathers, but adopted and perpetuated by all the people, through their respective State organizations, and thus becomes our own. It is natural that the citizen should have a more profound regard for the fundamental law of his State or government, than for a mere act of a legislature, because the former is more directly the work of his own hand. He has, by his vote, mediate or immediate, established it as the great charter of his rights, and by which all his agents or representatives in the conduct of the government, are required to square their actions. By the standard of the Constitution, he has a right to judge of the acts of every officer or body whose existence as such is provided for by it. By the same standard he must regulate his own acts, and to it he may at all times appeal for the protection of his rights, secured by it, and for a measured judgment upon his own conduct.

. I recognize most fully the right of every citizen to try every enactment of the legislature, every decree or judgment of a court, and every proceeding of the executive or ministerial department, by the written, fundamental law of the land. This must be done in a proper and legal manner, in conformity with the rules prescribed by that same law, or in accordance with its provisions; but no law is so sacred, no officer so high, no power so vast, that the line and the rule of the Constitution may not be applied to them. It is the source of all law, the limit to all authority, the primary rule of all conduct, private as well as official, and the citadel of personal security and liberty.

JUNE TERM
1854.

In re
Sherman M
Booth.

But, as was said before, though I recognize the right of every citizen to appeal to the Constitution in the proper manner, (not in any mode which the individual may prescribe for himself,) such appeal should be made in good faith, and not for the mere purpose of experimenting upon the opinions of the judicial officer to whom such application is made. Every citizen has the right to test every law by the Constitution of the State or National government, according to the forms, and through the appropriate tribunals of the country. Every one has a right to resist an unconstitutional enactment of the legislature ; but he does so upon his peril, until the conformity or non-conformity of the act with the Constitution is judicially determined. It is unsafe for any person to resist an act of the State or National legislature on the ground of its unconstitutionality, unless he is prepared to abide the consequences, in case his judgment should prove to be erroneous. Passive obedience cannot be exacted, nor can private judgment in this behalf become the rule of action.

But I do not admit the right of the citizen to complain to me of illegal imprisonment, and apply for a writ of Habeas Corpus for his discharge therefrom, and then waive or decline his discharge except upon such grounds only as he shall see fit to prescribe. While I am willing faithfully to discharge my duty in every instance when called upon, and to extend the protection of the law to every person entitled to its protection, I do not admit the right of any one to devise a fictitious imprisonment, merely to experiment upon my opinions or research in regard to particular questions of law which may chance to be deemed of more or less interest in the community. The petitioner has

June Term 1854:

In re Sherman M Booth.

complained that he is imprisoned without the authority of law, and asks my official interposition in his behalf. On the hearing, he sees fit to waive all objection to the form or substance of the warrant by which he is held, and to demand his discharge upon the invalidity of the law by virtue of which the warrant was issued, or not have it at all. I can neither permit nor accept such issue. If he really sought relief from his imprisonment by applying for this writ, he should be willing to enjoy such relief upon any ground which the law would sanction. If he did not really and in good faith desire release from imprisonment, but merely resorted to the writ of Habeas Corpus as a device by which to obtain an opinion as to the constitutionality of the Fugitive Slave Act, I feel bound to say that the occasion is not commensurate with the sacred character and beneficent functions of that writ.

I shall take this case, therefore, as the petition and the return to the writ present it for adjudication.

The act of Congress under and by virtue of which the petitioner is arrested, purports to have been enacted in conformity with, and under the power as is alleged, granted by the third clause of the second section of the fourth article of the federal Constitution, which is in the following words:

"No person held to service or labor in one State, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor; but shall be delivered up on claim of the party to whom such service or labor is due."

Either fortunately or unfortunately, we are left for a construction of this portion of the federal compact, almost exclusively to the meaning to be derived from

the words. There was very little debate upon the introduction or adoption of the clause, and but feeble aid is furnished from contemporaneous interpretation, for until a comparatively recent period, it has not become a subject of any very considerable discussion.

Without stopping here to inquire, whether the clause in question confers upon the general government any power of legislation in regard to the subject matter thereof, let us endeavor to arrive at its true intent and meaning, so far as it affects the rights or condition of the class of persons to whom it is supposed especially to refer.

Let it be taken for granted, that this clause was intended to refer exclusively to fugitive slaves; of which I think the history of its adoption into the Constitution leaves no doubt ; the question at once arises, how far, and in what particulars, does it affect the persons alluded to in it ? 1st. It contemplates the fact that certain persons were, or might be, held to service or labor in one or more States under the laws thereof. 2d. That it was by the laws of such State or States alone, under which such persons could be held to service or labor. 3d. That the laws or regulations of the respective States under which such persons might be held to service or labor, or discharged therefrom, might be different. 4th. That such persons might escape from one State in which they were held to labor under the laws thereof, into another State in which such persons were held to labor under different laws, or in which they were by the laws of the State discharged from service or labor. 5th. That the service or labor here spoken of is of a kind which is exacted of such persons by law, and not of a kind stipulated for by contract, and hence is in restraint of, and derogatory

to human liberty. 6th. That such persons escaping JUNE TERM 1854. from one State into another, should not be discharged by the laws of the State to which they may have fled, In re Sherman M Booth. but that the condition of the fugitive should remain the same in the State from which he had fled, in case the person to whom he owed the service should choose to claim him and convey him thither. 7th. That in the event of a claim by the person to whom the fugitive owed the service under the laws of the State from which he fled, being made, he should be delivered up, on establishing the fact that the labor or service of the fugitive was due to such claimant.

From this analysis of the clause of the federal Constitution above quoted, it will be seen that the *status* of the fugitive is essentially different in this State, from his *status* or condition in the State from whence he fled. In the latter, he remained subject to all the disabilities of his class, though he may have escaped from the domicil or premises of his master. Here, he is entitled to the full and complete protection of our laws; as much so as any other human being, so long as he is unclaimed. He may sue and be sued; he may acquire and hold property; he is, to all intents and purposes, a free man, until a lawful claim is made for him; and this claim must be made by the person to whom his service or labor is due, under the laws of the State from which he escaped. No one else can interfere with him. If no *claim* is set up to his service or labor by the person to whom his service or labor is due, there is no power or authority, or person on earth, that can derive any advantage from his former condition, or assert it, to his prejudice. So long as the owner does not choose to assert his *claim*, the cottage of the fugitive in Wisconsin is as much

3

his castle—his property, liberty and person are as much the subject of legal protection, as those of any other person. Our legal tribunals are as open to his complaint or appeal, as to that of any other man. He *may* never be claimed ; and if not, he would remain forever free, and transmit freedom to his posterity born on our soil.

It is apparent, therefore, that the fugitive slave leaves his condition of slavery behind him, and takes with him into this State only the dread contingency of the assertion of the claim of the person from whose service he has escaped, upon the establishment of which he may be reduced to his former condition in the State from which he fled.

The act of Congress of 1850 fully recognizes this view of the Constitution, and contemplates the re-capture of the fugitive, as dependent entirely upon the *claim* of the master. The sixth section provides that " the person or persons to whom such service or labor may be due, or his, her, or their agent or attorney, duly authorized by power of attorney, *in writing*, acknowledged and certified under the seal of some legal officer or court of the State or Territory in which the same may be executed, may pursue and claim such fugitive person," &c. No one but the owner, or his agent or attorney, appointed by writing, may claim him. No one may volunteer to render his neighbor a friendly service, by capturing in his behalf and returning to him his fugitive. It must be the master's own act, and its responsibilities be all his own.

This writ simply asserts, as the cause of the petitioner's arrest, that he " aided, abetted and assisted a person named Joshua Glover, held to service or labor in the State of Missouri, under the laws thereof, and

being the property of Benammi S. Garland, and hav-

ing escaped therefrom into the State of Wisconsin; to escape from the lawful custody of Charles C. Cotton, a deputy of the marshal of the U. S., the said Charles C. Cotton having then and there arrested and taken into custody the said Joshua Glover, by virtue of a warrant issued by the judge of the United States, for the said District, pursuant to the provisions of the act of Congress, in that case made and provided, approved Sept. 18, 1850."

The material allegations herein contained are, that Glover was held to service or labor, in the state of Missouri, under the laws thereof, had escaped therefrom, and was the property of Garland. All this may be very true, and yet Garland may never have *claimed* Glover. Some one else may have caused the arrest, without the authority or wish of Garland. There is no allegation that he was claimed by any one whomsoever; much less that the claim of Garland was interposed, without which Glover was as free as Garland himself. It is true, the writ recites that Glover was in the *lawful* custody of the marshal, by virtue of a warrant issued by the district judge under the provisions of the act of 1850. But it is to be remarked that the mere recital that such custody was lawful, is not sufficient. The lawfulness must affirmatively appear, by facts set forth in the warrant. But, admitting that Glover was in the lawful custody of the marshal, it still does not appear that he was in such custody as a fugitive from labor. Though the warrant for his arrest was issued under the act of 1850, yet it by no means follows that he was arrested as a fugitive The petitioner is arrested under that act, and Glover may have been charged with some violation of it, for

JUNE TERM
1854.

In re
Sherman M
Booth.

which he was liable to arrest. The gist of the offence with which the petitioner is charged, as described by the act of 1850, is " the aiding, abetting or assisting the *person so owing labor or service*, to escape from such claimant, his agent or attorney, or other person or persons legally authorized, as aforesaid." There certainly is no such charge in the warrant of commitment returned here. There is no averment of a *claim* by Garland, even admitting that the allegation of property in Garland implies that service or labor was due to him. There is no allegation that Glover was in custody as a fugitive from labor, or that the petitioner aided in his escape from any *claimant*, his agent or attorney, nor any other person lawfully authorized to hold him as such fugitive.

I have been referred to two or three cases, going to show that strict technical exactness is not required in preliminary warrants. This is undoubtedly the true doctrine. Where the defendant was charged in the warrant with having committed the crime of larceny, it was held sufficient. ( *Whart. Prec.* 502.) But in all these cases, the language used imported a crime— an act *malum in se*. In all cases where the offence is merely *malum prohibitum*, it must be set out in the warrant substantially in conformity with the statute which creates it.

The offence here charged is peculiarly the creature of the statute. It is not resistance to the marshal in the execution of his duty; it is not the breaking open the jail; that is an offence against the State; it is not a rescue as known to the common law, but it is intended to be the aiding of a fugitive slave to escape from the service to which he is held. It is a penal statute, and must be construed strictly. It is in restraint of

freedom, and therefore every presumption arising un-

der it must be in favor of liberty. It creates a new offence, and adds new and severe penalties, and there- fore all process and prosecution under it must be in substantial conformity with its requirements. I do not mean to say that a warrant for arrest or commit- ment for trial must contain all the particularity of an indictment, but to say what I understand the law to be, that it must contain the substance of the offence intended to be charged, as the same is described in the statute. No greater strictness is applied to this war- rant than the law applies to all process of that class; though a much stricter rule might be justified ; for this is a " wicked and a cruel " enactment, and those who feel compelled to execute it, may well require of those who demand official service at their hands, that in taking their " pound of flesh" they shall not " shed one drop of Christian blood."

Since the close of the argument upon this case, there has been placed in my hands the act of Congress, ap- proved Feb. 26, 1853, commonly called the fee bill. That act provides, among the various provisions in regard to the fees of officers, witnesses, etc., as follows: " When two or more charges are, or shall be made, or two or more indictments shall be found against a per- son, only one writ or warrant shall be necessary to ar- rest and commit him for trial, and it shall be sufficient to state in the writ the name or general character of the offence, or to refer to them in very general terms."

This provision does not change the law ; it is only designed as a restraint upon the clerk or commission- er, preventing him from issuing a multiplicity of war- rants, where one would answer, and to guard against unnecessary prolixity, merely for the purpose of swel-

ling the fees of such officer where he is paid by the folio. What had been the experience of Congress or heads of departments, which suggested this enactment, I do not know; but it certainly was never designed to create, nor does its language tend to establish, a new rule of law, abrogating the law which requires the charge against the citizen to be plainly set forth in the warrant for his arrest. Here are not two offences charged, and if there were, the rule of law would be the same.

The warrant, a copy of which is returned by the marshal, as the authority by which the prisoner is held, is clearly, substantially and radically insufficient, and the petitioner is therefore entitled to a discharge.

And here, perhaps, I might dismiss this case, and avail myself of the defect of the process to escape from the performance of any further duty in the premises ; but it is further urged that the act of Congress of 1850 is unconstitutional and void. I would gladly escape from the responsibility of deciding upon a question so grave. It would be a much more easy and quiet course to stop here, if I could reconcile such a course with my sense of duty. But believing, as I do, that every State officer who is required to take an oath to support the Constitution of the United States as well as of his own State, was designedly placed by the federal Constitution itself as a sentinel to guard the outposts as well as the citadel of the great principles and rights which it was intended to declare, secure and perpetuate, I cannot shrink from the discharge of the duty now devolved upon me. I know well its consequences, and appreciate fully the criticism to which I may be subjected. But I believe most sincerely and solemnly that the last hope of free,

representative and responsible government rests upon

the State sovereignties, and fidelity of State officers to their double allegiance, to the State and federal government; and so believing, I cannot hesitate in performing a clear, an indispensable duty. Seeking and enjoying the quiet and calm so peculiar to the position in which I am placed, I desire to mingle no farther in the political discussions of the times, than the clear suggestions of official obligation require. But he who takes a solemn oath to support the Constitution of the United States, as well as of the State of Wisconsin, is bound by a double tie to the nation and his State. Our system of government is two-fold, and so is our allegiance. Federal officers feel less of this, because their oath binds them only to the Constitution of the United States ; but State officers have the weight of both resting upon them. To the latter is peculiarly the duty assigned, or rather upon the latter, of necessity does the obligation rest, of ascertaining clearly, and of asserting firmly, the peculiar powers of both governments, as circumscribed by the fundamental law of each. To yield a cheerful acquiescence in, and support to, every power constitutionally exercised by the federal government, is the sworn duty of every State officer ; but it is equally his duty to interpose a resistance, to the extent of his power, to every assumption of power on the part of the general government, which is not expressly granted or necessarily implied in the federal Constitution.

Nor can I yield to the doctrine early broached, but as early repudiated, that any one department of the government is constituted the final and exclusive judge of its own delegated powers. No such tribunal has been erected by the fundamental law. The judi-

cial department of the federal government is the creature by compact of the several States, as sovereignties, and their respective people. That department can exercise no power not delegated to it. All power not delegated, and not prohibited to the States, the States have expressly reserved to themselves and the people. To admit that the federal judiciary is the sole and exclusive judge of its own powers, and the extent of the authority delegated, is virtually to admit that the same unlimited power may be exercised by every other department of the general government, both legislative and executive, because each is independent of, and co-ordinate with the other. Neither has any power but such as the States and their respective people have delegated, and all power not delegated remains with the States and the people thereof. In view of the vastly increasing power of the federal government, and the relatively diminishing importance of the State sovereignties respectively, the duty of the latter to watch closely and resist firmly every encroachment of the former, becomes every day more and more imperative, and the official oath of the functionaries of the States becomes more and more significant. As the power of the federal government depends solely upon what the States have granted, expressly or by implication, and as no common judge has been provided for, to determine when the one or the other shall be proved unfaithful to the compact, the solemn pledge of faith exacted from both has been deemed an effectual guaranty ; and a frequent recurrence to the fundamental principles on which our government is organized, a sufficient stimulus to every public officer and to the people at large, both to yield and exact a perfect conformity. But I solemnly be-

June Term 1854.

In re Sherman M Booth.

lieve that the last hope of free representative and federative government, rests with the States. Increase of influence and patronage on the part of the federal government naturally leads to consolidation, consolidation to despotism, and ultimate anarchy, dissolution and all its attendant evils.

If the sovereignty of the States is destined to be swallowed up by the federal government; if consolidation is to supplant federation, and the general government to become the sole judge of its own powers, regardless of the solemn compact by which it was brought into existence, and of the source of its own vitality, as an humble officer of one of the States, bound to regard the just rights and powers both of the Union and the States, I want my skirts to be clear, and that posterity may not lay the catastrophe to my charge. I am truly thankful for the same feeling of conscientious firmness on entering upon the discharge of the duty before me, as would be required in case of direct invasion, open rebellion, or palpable treason, against our common country.

Without the States there can be no Union; the abrogation of State sovereignty is not a dissolution of the Union, but an absorption of its elements. He is the true man, the faithful officer, who is ready to assert and guard every jot of power rightfully belonging to each, and to resist the slightest encroachment or assumption of power on the part of either.

The Constitution of the United States is a peculiar instrument, and it has brought into existence and operation a peculiar system of government. But little if any aid is furnished in its construction by analogy. It is not merely a grant of powers. It not only confers powers upon the federal government, but it

June Term
1854.

In re
Sherman M
Booth. guarantees rights to the States and to the citizens. It was not designed merely to provide a general government for all the States, but to provide security and protection for the States and people, who are parties to the compact by which it is created. Not only did it confer certain powers upon the general government, but it imposed solemn duties upon the government thereby created, and upon the States who were its creators. More than this, it solemnly enjoined upon both the state and general government, the exercise of certain powers and duties, and the abstaining by each, from the exercise of powers and functions exclusively pertaining to the other.

It is an instrument of grants and covenants. Somewhat like an indenture of conveyance, it contains not only grants of powers, but covenants for the faithful observance of the stipulations therein contained. It creates three distinct departments of government, the executive, legislative and judicial, and grants to each, the powers which it was designed that they should respectively exercise; and those powers not granted or prohibited to the States, it especially reserved to the States and the people. In addition to this, the States, parties to the instrument, by it, solemnly and mutually engaged that they would do certain things, and that certain things should not be done either by the government of the Union or of the States. The language of the Constitution is so peculiar, that the distinction between power to be conferred upon the government about to be created, and covenants entered into between the parties, as States, is obvious at a glance. Congress may exercise all the legislative power granted in the Constitution, but no other, because all others are especially reserved to the States and to the peo-

ple.  In the same article which grants the legislative powers to Congress, and enumerates and defines them, is contained also a prohibitory covenant or compact by which the States have agreed not to do certain things, which, before, as sovereignties, they had an undoubted right to do.  " No State shall grant letters of marque and reprisal, coin money, emit bills of credit, make any thing but gold and silver coin a legal tender, pass any bills of attainder, ex post facto law, or any law impairing the obligation of contracts," &c.

Now suppose, in violation of this compact, any State should do any of the things herein prohibited.  Is it pretended that Congress has the right to make such acts on the part of the officers of the State penal? or by legislation, call such offending State to account? exclude it from the Union? expel its representatives from their seats? arrest its executive, its legislators and judges, and imprison them?  The acts of such State would be simply void; and it would be the duty of all courts, both Federal and State, so to declare them.  They would afford no protection to any person or officer acting under them, not because Congress has any legislative power to denounce or abrogate them, but because they are in violation of the fundamental law.

So also, in the same section are contained sundry prohibitions upon the United States, among which is the following : " The privilege of the writ of Habeas Corpus shall not be suspended, unless when in cases of rebellion or invasion the public service may require it."  Suppose, in a time of profound peace and quiet, the federal government should pass a law suspending the privileges of this writ, would the State governments have the power to call to account the federal

JUNE TERM
1854.

In re
Sherman M
Booth.

officers who had violated the compact in this behalf? the Congress who passed, and the executive who approved it? Would the State courts be bound by it? Not at all. Such an act of Congress would simply be void, and it would be the duty of every State and Federal court so to pronounce it, and it would afford no protection to any officer, State or Federal, for refusing to obey such writ. I mention these illustrations to show that a great portion of our federal constitution rests in compact, while still another rests in grant. Where powers are granted, they are to be exercised; where rights rest in compact, they have still the force of law; but the federal government has no power to legislate upon them; they are to be obeyed and enforced by the parties to the compact, the States themselves.

I come now to consider the fourth article of the federal constitution. The first section provides that " Full faith and credit shall be given in each State to the public acts, records and judicial proceedings of every other State," &c. The first appearance of the various provisions of this article (except that in relation to fugitives from labor) in the National Convention, was in the "plan of a federal constitution," submitted by Charles Pinckney, of South Carolina, May 29, 1787. (2 *Mad. Pap.*) That plan contained no reference to fugitives from labor. Various plans were submitted and referred, propositions made, and adopted or rejected, when, on the 25th day of July, 1787, a committee of detail was appointed, consisting of seven members, of which Mr. Rutledge, of South Carolina, was chairman, "to report a Constitution conformable to the resolutions passed by the convention." 2 *Mad. Pap.* 1197.

On the 6th day of August, Mr. Rutledge, from the committee of detail, made a report. In that report, the several sections now contained in the fourth article (except the clause in relation to fugitives from labor, which had not yet been thought of,) followed each other, and the article in regard to records, as yet stopped with the mere assertion of the covenant, that full faith, &c., should be given to them; no power was given to Congress over the matter as yet.

The first suggestion that appears in regard to fugitives from labor, was made on the 28th day of August, 1787, when article 15, as reported by the committee of detail, was taken up. The article provided for the surrender of fugitives from justice.

Mr. Butler and Mr. Pinckney, (of S. C.) moved to require fugitive slaves and servants to be delivered up like criminals.

Mr. Sherman saw no more propriety in the public seizing and surrendering a slave or servant than a horse.

Mr. Butler withdrew his proposition in order that some particular proposition might be made *apart from this article. Mad. Pap*, 1447-8.

On the 29th of August, the provision in regard to public acts and records, came under consideration, when various propositions of amendment were made and were finally referred to a committee of which Mr. Rutledge was chairman. On the first of September, the article among other matters was reported back, and now, for the first time, was incorporated in it a power on the part of Congress to legislate upon the subject. Dr. Johnson, of Connecticut, objected to the grant of such power, because it would authorize the General Legislature to declare the effect of the

June Term
1854.

In re
Sherman M
Booth.

legislative acts of one State in another State, and Mr. Randolph objected that it might enable the government to usurp all State powers. After some amendments the report was agreed to ; and thus, in addition to the compact by which full faith and credit were covenanted to be gi٭en to the public acts, records, &c., of one State by every other State, Congress was granted the "power to prescribe by general laws the manner of proving them and the effect thereof."

This history is important, as it not only justifies and requires a distinction to be taken between grants of power and articles of compact, but it clearly demonstrates that the convention all along discriminated between grants of power to the government, and articles of compact between the States, and was extremely jealous and cautious in making such grants, and only did so when it was deemed absolutely necessary.

Having now traced through this compact, and discovered the time and manner when it became coupled with a power, let us trace along its neighbor, in regard to the reclaiming of fugitive slaves, and discover, if we can, the time and manner in which it shall be coupled with a grant of power to Congress, to secure its efficacy by legislation. We have seen that the first suggestion in regard to the subject was on the 28th day of August, when Mr. Pinckney and Mr. Butler moved to connect it with the surrender of fugitives from justice, but withdrew the proposition for the purpose of making a separate provision. On the 29th day of August, Mr. Butler offered such provision in these words :

"If any person bound to service or labor in any of the United States, shall escape into another State, he

or she shall not be discharged from such service or labor in consequence of any regulations subsisting in the State to which they escape, but shall be delivered up to the person justly claiming their service or labor." "Which was agreed to *nem con*."

Here we have all the discussion upon the subject. Plan after plan for the organization of the government was made and presented, resolution upon resolution offered and discussed, embracing the whole ground of Federal and State rights and powers, without one word being mentioned of fugitive slaves; and when it did occur to the minds of some members, suggested, unquestionably, by the clause in regard to fugitives from justice, it is quietly agreed that the States would deliver up such fugitives from labor. No power was asked for the federal government to seize them; no such power was dreamed of; the proposition that the States should respectively deliver them up, was acquiesced in without any dissent. Yet we are told *arguendo* by judicial authority, that without such a clause the Union could not have been formed, and that this provision was one of the essential compromises between the South and the North. In point of fact, it did not enter in the slightest degree into the compromises between the North and South. I have had time and opportunity to examine the debates in the conventions for the adoption of the Constitutions of only the States of North Carolina and South Carolina. In the former, the whole of article four was read, and though the grants of power, as contradistinguished from mere compact, were scrutinized closely, no objection was made to the absence of such grant, but the article was acquiesced in with only a few words of explanation from Mr. Iredell, who

JUNE TERM
1854.

In re
Sherman M
Booth.

stated that the "northern delegates, owing to their particular scruples on the subject of slavery, did not choose the word *slave* to be mentioned, but that was their meaning." In the South Carolina convention, I have been unable to find a word of comment upon the subject. In Virginia, it was discussed by Messrs. Madison and Randolph, who never claimed for it the character of a power delegated to the national government. It is nowhere mentioned as entering into the compromises of the Constitution. How, then, can any one say, that without this provision the Union could not have been formed? And yet such assertion, contradicted by the truth of history, is made the pretext for the exercise of powers by the general government, that could not stand for a single moment upon a similar basis, in respect to any other subject matter.

We have seen how the power of legislation was granted to Congress in respect to public records, &c. We have seen that no such power is granted in respect to the surrender of fugitives from labor, and that it was not even asked for; and from the known temper and scruples of the national convention, we may safely affirm, that had it been asked it would not have been granted, and had it been granted, no Union could have been formed upon such a basis. The history of the times fully justifies this conclusion. Can it be supposed for a moment, that had the framers of the constitution imagined, that under this provision the federal government would assume to override the State authorities, appoint subordinate tribunals in every county in every State, invested with jurisdiction beyond the reach or inquiry of the State judiciary, to multiply executive and judicial officers *ad infinitum*,

wholly independent of, and irresponsible to the police

regulations of the State, and that the whole army and navy of the Union could be sent into a State, without the request, and against the remonstrance of the legislature thereof; nay, even that under its operation the efficacy of the writ of Habeas Corpus could be destroyed, if the privileges thereof were not wholly suspended; if the members of the convention had dreamed that they were incorporating such a power into the constitution, does any one believe, that it would have been adopted without opposition and without debate? And if these results had suggested themselves to the States on its adoption, would it have been passed by them, *sub silentio*, jealous as they were of State rights and State sovereignty? The idea is preposterous. The Union would never have been formed upon such a basis. It is an impeachment of historic truth, to assert it.

The clause in regard to public records forms one section by itself, with its grant of power added upon full consideration. The second section of the same article contains three clauses, but all grouped and numbered together.

" The citizens of each State shall be entitled to all privileges and immunities of citizens of the several States."

"A person charged in any State with treason, felony, or other crime, who shall flee from justice and be found in another State, shall on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime."

" No person held to service or labor in one State, under the laws thereof, escaping into another, shall, in

June Term
1854.

In re
Sherman M
Booth.
consequence of any law or regulations therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such labor or service may be due."

Here is the whole of the section, without one word of grant, or one word from which a grant may be inferred or implied. Congress has the same power to legislate in regard, to fugitives from justice or labor. But it may be asked, how are the rights here stipulated and guaranteed, to be enforced? I answer, that every State officer, executive, legislative and judicial, who takes an oath to support the Constitution of the United States, is bound to provide for, and aid in their enforcement, according to the true intent and meaning of the Constitution. But what if one or more States should refuse to perform their duty, and its officers violate their oaths and repudiate the compact? This question is answered by asking another—What if Congress should declare a single violation of one of its laws, treason, and that a conviction thereof should work corruption of blood and forfeiture of estate beyond the life of the person attainted, and the judicial department should pronounce it valid, and the executive attempt to enforce it? The simple answer is, that when the State and federal officers become so regardless of their oaths and obligations as either question implies, anarchy or revolution, or both, must supervene, for the government would be a wilful departure from the fundamental law of its organization, and the people would be absolved from their allegiance to it. I do not mean to say that every minor, or unintentional departure from the constitution must work such disastrous results. On the part of the States and people there is a fixed attachment to the Constitution,

JUNE TERM
1854:

In re
Sherman M
Booth.

and when its provisions are violated or its restraints overleaped, discussion ensues, and the government is brought back to the constitutional tack; but I repudiate the degrading insinuation that State officers are less faithful to the constitution, than federal officers. On the contrary, from the very fact that upon them is devolved the duty and responsibility of guarding the rights and sovereignty of the States under the compact of the Union, they must necessarily be more watchful of the exercise or assumption of power, on the part of the States respectively and of the general government, than federal officers would naturally be.

· It may be again repeated, and cannot be repeated too often, that upon the States rests the immense responsibility of preserving not only their own sovereignty, but the just constitutional powers of the general government. Let it also be remembered, that the States and their civil functionaries are as essential to the existence and operation of the government of the Union as are the peculiar officers of the latter. Each and all are parts of a united whole, and all are bound by the most solemn ties of fidelity to all and every part thereof.

What would be thought by the people of this country, should Congress pass a law to carry into effect that clause of the fourth article in regard to citizenship? and declare pains and penalties against any State functionary who should fail to comply? What would be thought if Congress should declare it a penitentiary offence, for any executive of a State to refuse to surrender a fugitive from justice? What state would submit to see its chief magistrate dragged before the federal tribunals, on charge of infraction of such a law, or what federal court would assume to compel his obe-

JUNE TERM
1854.

In re
Sherman M
Booth.
dience by mandamus? And yet the assumption of power to legislate at all upon the subject, is assuming supreme and unlimited power over the whole matter. There is no middle ground. A bare statement of the proposition assumed, is its most effectual refutation.

The law of 1793 was in fact but little, if any more than organizing the State authorities for the accomplishment of the constitutional duties devolved upon them. For that very reason it passed without scrutiny, and for a long time was obeyed without question. It was *practically* nothing more than the states themselves carrying out the constitutional compact. Not until it began to be required that the States should yield up all control over these subjects, and a prostration of their sovereignty was demanded, did attention become aroused. No importance therefore can justly be attached to the fact that this act was passed by an early Congress and was signed by the father of his country, and was acquiesced in by the states and people. It is a remarkable fact that the most startling deviations from strict constitutional limits occurred in the very earliest years of the Republic. So it must always be. But time, discussion, and experience have heretofore proved adequate correctives. So may they ever prove. Added to these, State sovereignty jeopardized, federal encroachment apprehended, and consolidation menacing, can hardly fail to accomplish the desired ends.

To my mind therefore, it is apparent that Congress has no constitutional power to legislate on this subject. It is equally apparent, that the several States can pass no laws, nor adopt any regulations, by which the fugitive may be discharged from service. All such laws and regulations must be declared void whenever they

are brought to the test of judicial scrutiny, state or

national. It is equally apparent, that it is the duty of the respective States to make laws and regulations for the faithful observance of this compact. They have generally done so, and doubtless would have continued so to do, but for the decision of the United States Supreme Court, in the case of *Prigg versus Commonwealth of Penn.* It is still their duty so to do.

Again, it is to my mind apparent, that the provision of the constitution in regard to fugitives from labor or service, contemplates a judicial determination of the lawfulness of the *claim* which may be made.

Mr. Butler, of South Carolina, who reported the clause, for the first time, Aug. 29th, 1787, framed its conclusion as follows: " but shall be delivered up to the person JUSTLY claiming their service or labor." How was the *justice* of the claim to be ascertained? Who were to determine it?—Fugitives were not to be discharged in consequence of any law or regulation of the States to which they may have fled. Not discharged by whom? The federal government? No, but by the States, in consequence, or by virtue of any law or regulation therein. "But shall be delivered up." By whom? Evidently by the same power which had covenanted not to discharge them. Shall be delivered up by the States, not *seized* by the federal government.

The clause as finally adopted reads, " but shall be delivered up on claim of the party *to whom such service or labor is* DUE." Here is a fact to be ascertained, before the fugitive can be legally delivered up, viz : that his service or labor is really due to the party who claims him. How is the fact to be ascertained? A claim is set up to the service of a *person.* He who

June Term
1854.

In re
Sherman M
Booth.

makes the claim is denominated by the Constitution a party. The claimant is one party, the person who resists the claim is another party. If he really owes the service according to the laws of the State from which he is alleged to have escaped, and has in fact escaped, he must be delivered up. If the claim is unfounded, he cannot be delivered up. The Constitution itself has made up the issue, and arranged the parties to it. Can any proposition be plainer, than that here is suspended a legal right upon an issue of fact, which can only be determined by the constitutional judicial tribunals of the country? It bears no analogy to the extradition of fugitives from justice. In the latter case, no issue is presented by the Constitution. Judicial proceedings have already been commenced, and this is but a species of process to bring the defendant into court. No *claim* is to be determined. He is to be delivered up from the mere fact that he is charged, to be removed to the State demanding him for trial. He is placed in the custody, and under the protection of the law, in the regular course of judicial proceedings. But in the former case there can be no delivery until the claim is tried and determined, and then the fugitive is delivered, not into the custody of the law, but into the possession and control of the party who has established his claim; not to be removed to another State or tribunal for trial, with the shield of the law over him, but to be reduced, without further process or trial, to absolute subjection, to be taken whithersoever the claimant may desire. In the one case, the proceedings are commenced and terminated where the claim is made; in the other, the suit is commenced where the offence is committed, and the law sends out its process to bring in the defendant

to meet the charge. While that process is being served, through all its mutations, he is as much under the protection of the law as he who executes it, and in its eye, both are equal.

Here there is a fact, an issue, to be judicially determined, before a right can be enforced. What authority shall determine it? Clearly the authority of the State whose duty it is to deliver up the fugitive when the fact is determined. Until the issue which the Constitution itself creates, is decided, the *person* is entitled to the protection of the laws of the State. When the issue is determined against the fugitive, then the constitutional compact rises above the laws and regulations of the State, and to the former the latter must yield.

To my mind this seems very clear and simple. The whole proceeding is clearly a judicial one, and I will not stop here to demonstrate what, from the preceding remarks, appears so obvious. The law of 1850, by providing for a trial of the constitutional issue, between the *parties* designated thereby, by officers not recognized by any constitution, State or national, is unconstitutional and void.

It has been already said, that until the claim of the owner be interposed, the fugitive in this State is, to all intents and purposes, a free man.

The interposition of the claim, by legal process, is the commencement of a suit. "A suit is the prosecution of some claim, demand, or request." 6 *Wheat.* 407. The trial of such claim is the trial of a suit. Therefore the trial thereof must not only be had before a judicial tribunal, but whether proceedings be commenced by the fugitive to resist the claimant, or by the claimant to enforce, and establish his claim, it

JUNE TERM
1854.

In re
Sherman M
Booth.

would seem that either party would be entitled to a jury. It is no answer to this position to say that neither the States nor the General Government have provided means for such a mode of trial. The Constitutional right of the party remains the same. The late organization of our County Courts, failed to provide a trial by a constitutional jury, yet the Supreme Court held that parties were nevertheless entitled to demand it. If provision is not made for such a trial, it is the duty of the proper authority to make it. Nor is it any answer to this position to say, that the proceeding to reclaim and re-possess a fugitive from service, is not a " suit at common law." This question is already settled. It has been judicially determined that the term " common law " was used in the Constitution in contradistinction to suits in admiralty or equity. Were it otherwise, Congress need only to change the common law form of procedure, to nullify the right of trial by jury in all cases. *See Story Comm.* 645, *et seq.*; 3 *Pet.* 446.

Mr. Justice Story says, " in a just sense, the amendment may well be construed to embrace all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume, to settle legal rights." We have already seen that the legal right of the claimant must be settled before a fugitive from labor can be delivered up. We have already seen that a *suit* is held to be " the prosecution of some claim, demand, or request." The conclusion seems to be irresistible, therefore, that the prosecution of the claim to a fugitive from labor, or resistance to such claim by legal proceedings on the part of the fugitive, is a *suit*, not in equity or admiralty, and hence at common law, within the purview

of the Constitution. Of course I do not pretend to say that such a proceeding is technically a suit at common law ; nor is a proceeding by foreign attach- ment, and many other proceedings which are held to be embraced by the jury provision of the Constitution. Authorities might be multiplied on this subject, were it necessary.

Again, it is said that the Constitution evidently contemplates a summary mode of proceeding in the case of a fugitive from labor. Where is the evidence of it? Nothing of the kind is found in the history of the provision, nor in its pathway to the Constitution. Nothing of the kind is apparent from the language used ; for it distinctly imports a trial of the claim, and a determination of the fact that labor or service is due to the claimant before a delivery can be made. When the evidence of such an intention is furnished, there will be time enough to trample down all forms of law, and set at naught every settled rule of construction. But, admit the fact. A provision may be made for obtaining a jury in a summary manner, as is sometimes done for the trial of the right of property seized by attachment. But I can pursue this subject no further.

Again, the Constitution provides that no person shall be deprived of life, liberty or property, without *due process of law.* This last phrase has a distinct technical meaning, viz: regular judicial proceedings, according to the course of the common law, or by a regular suit commenced and prosecuted according to the forms of law. An essential requisite is due process to bring the party into court. It is in accordance with the first principles of natural law. Every person is entitled to his " day in court," to be legally

June Term 1854.

In re Sherman M Booth. notified of the proceedings taken against him, and duly summoned to defend. The passing of judgment upon any person without his " day in court ; " without due process, or its equivalent, is contrary to the law of nature, and of the civilized world, and without the express guaranty of the Constitution, it would be implied as a fundamental condition of all civil governments. But the tenth section of the act of 1850, expressly nullifies this provision of the Constitution. It provides that the claimant may go before any Court of Record, or judge, in vacation, and without process, make proof of the escape, and the owing of service or labor ; whereupon a record is made of the matters proved, and a general description of the person alleged to have escaped ; a transcript of such record made out and attested by the clerk with the seal of the court, being exhibited to the Judge or Commissioner, must be taken and held to be conclusive evidence of the fact of escape, and that service or labor is due to the party mentioned in the record, and *may* be held sufficient evidence of the identity of the person escaping.

Here is a palpable violation of the Constitution. Can that be said to be by due *process* of law which is without process altogether ? Here the *status* or condition of the person is instantly changed in his absence, without process, without notice, without opportunity, to meet or examine the witnesses against him, or rebut their testimony. A record is made, which is conclusive against him, "in any State or Territory in which he may be found." It is not a process to bring the person before the court in which the record is made up, but it is to all intents and purposes, a judgment of the court or judge, which commits the

person absolutely to the control and possession of the

claimant, to be taken whithersoever he pleases, to be dragged from a State where the legal presumption is in favor of his freedom, to any State or Territory where the legal presumption is against his freedom.

Is not this depriving a person of liberty without due process of law? Other Courts and other Judges, may pronounce this provision of the Act of 1850 to be in conformity with that provision of the Constitution which declares that "no person shall be deprived of life, liberty or property, without due process of law," but while I have a mind to reason and a conscience to dictate me, and an oath to support the Constitution of the United States resting upon my soul, I cannot so declare it, and for the price of worlds I will not.

Upon this branch of that act I am not aware that there has been any adjudication. Certainly there has been none that can be claimed as authority here. The same may be said in regard to the trial by Jury. There are other points equally fatal to this act when tested by the Constitution, but I have not time nor inclination now to discuss them.

I ought not to dismiss the consideration of this question, without particularly adverting to the case of *Prigg vs. The Commonwealth of Penn.*, 16 *Peter's Rep.* 540. The opinions in the other cases cited, are so conflicting, casual, or incidental, as to be of no force; and of the case of *Prigg vs. Penn.*, it may be justly remarked that the discrepancy of opinion among the members of the court, was so wide and fundamental, as greatly to impair the authority of that decision. It affirms the constitutionality of the act of 1793 upon contemporaneous exposition, in one respect, and ex-

pressly defies the same rule in another, for it pronoun-
ces the act constitutional in part, and unconstitutional
in another part. Whatever of authority may attach
to it in consequence of the character and eminence of
the men who passed it, and of him who signed it, is
effectually counteracted by the decision of the court
that in one part of it, at least, the constitution was
violated. Contemporaneous construction confers the
power of legislation and execution upon the States as
well as Congress; for, long before Congress assumed to
act upon the subject, the State legislature had passed
laws in fidelity to the compact, in most of which some
of the framers of the constitution had seats, and all of
the slave States, and all or nearly all the free States
continued to exercise the power up to a very recent
period.

Contemporaneous history, contemporaneous exposi-
tion, early and long continued acquiescence, all go to
show the interpretation given to this provision of the
Constitution by the States and the people. The slave
States passed acts to execute the compact. The free
States did the same. The action of the several States,
or many of them, shows conclusively that they inter-
preted the provision as a compact merely addressed to
the good faith of the States. The slave States appealed
to the free States for legislative action to carry into
effect this provision of the federal Constitution, and de-
manded of the latter the stern exercise of a power
which it is now sought to wrest from them. In 1826,
the State of Maryland appointed commissioners to at-
tend upon the session of the legislature of Pennsyl-
vania and induce the latter to pass an act to facilitate
the reclamation of fugitive slaves. Their mission was
successful. Pennsylvania yielded to the solicitations

of Maryland's commissioners, and passed the act of
1826, which was afterwards declared void by the Su-
preme Court of the United States in *Prigg vs. Penn*
In 1836 or 1837, similar commissioners were appoint-
ed by the State of Kentucky to the State of Ohio,
whose mission resulted in the passage of a most string-
ent fugitive act by the legislature of Ohio.  So also,
about the same time, in regard to Indiana, and I be-
lieve Illinois.  Up to 1837, the States esteemed it
their duty, and slave States demanded its performance,
to provide by law, for the execution and faithful ob-
servance of this compact.  All seemed to regard it as
a compact and nothing else ; binding, it is true, and
operative as law equally upon all, but still a compact
and a compact only.

Again, it is respectfully suggested, that the whole
argument of Mr. Justice Story is based upon what is
sometimes called the *petitio principii*.  He assumes
that the constitution makes it the duty of the federal
government to enforce the right of the owner secured
by the compact, and then infers that it must neces-
sarily have the power, and then, if Congress has it, the
States cannot have it.

All admit that there is no express power in the Con-
stitution to legislate upon this subject, but it is claim-
ed to be necessarily implied, as incidental to the grant
of judicial power.  The reclamation of a fugitive is
first decided to be a "case" arising under the Consti-
tution of the United States, and hence within the
judicial power.  But this mode of implying powers
can never be sustained.  The judicial power is exten-
ded in several respects beyond the legislative power.
The judicial power has jurisdiction in cases arising
between the citizens of different States.  A citizen of

New York may sue a citizen of Wisconsin, upon a promissory note, bill of exchange, covenants in a deed, in partition of real estate, or even in ejectment for the possession or title to lands. · If a power of legislation may therefore be grafted by implication upon a judicial power, Congress may assume the whole power of legislation over these subjects in the respective States, and necessarily exclude State legislation, and accomplish at a blow the complete prostration and overthrow of the State sovereignty. Other illustrations might be given to manifest the danger of engrafting a legislative power upon a judicial, by implication. This was tried at an early day, and by the same course of reasoning, common law jurisdiction was claimed for the courts of the United States, and power of legislation over all common law subjects, claimed by implication in Congress. The Alien and Sedition laws were chiefly defended on these grounds.

On the contrary Chief Justice Taney, in his dissenting opinion, though he admits the right of Congress · to legislate, but does not argue it, thinks the compact peculiarly enjoins the duty upon the States.

Again, this case explicitly decides the claim of the owner to a fugitive slave to be a " case" within the meaning of the Constitution; hence it is a suit, not in admiralty, or equity, and hence at common law, within the meaning of the Constitution. It also decides the determination of the claim to be a *judicial* proceeding, and bases the power of the federal government in the premises, upon the grant of judicial power, and the power of legislation is assumed to be incidental to that. All these points, which are held to be *res adjudicata*, strike at the very vitality of the act of 1850, which attempts to confer such judicial

power upon Commissioners. Time will not permit a

further review of this case. In my judgment the opinion of the Chief Justice completely overthrows that of the Court, and so far as he attempts to argue his points, beyond doubt or controversy, establishes the doctrine here contended for.

In view of the dissentient opinions of the members of the Supreme Bench; in view of the discrepancy of opinion which has characterized all other decisions wherein the question has been raised and argued; in view of the fugitive character of the power here claimed by Congress, leaping from article to article, from section to section, and from clause to clause, hovering now over a grant, then over a compact, fluttering now around an implication, then around an incident, to find whereon it may rest its foot; in view of the alarm which has seized upon many of the States in consequence of the enormous power which it has called upon Congress to assume in its behalf, and the deep wounds which it seeks to inflict upon the rights and sovereignty of the States, and upon the great principles of human freedom; in view of all this, are we not justified in asking of the Supreme Court of the United States to review their decision as the majority pronounced it in the case of *Prigg vs. Commonwealth of Pennsylvania?*

If, after all the principles of that decision shall be re-affirmed, there still remain the great questions of trial by jury, the unauthorized delegation of judicial power, the *exparte* proceedings, without process, which change the *status* of the person whose liberty is attacked, and some others untouched and undetermined.

We thus find ourselves without any authoritative judicial guide in relation to the Act of 1850. The

June Term 1854.

In re Sherman M Booth.

fundamental questions here raised, have, some of them, been controverted for some years, and those which it was the design to settle in the case just quoted, remain yet as fruitful subjects of bitter discussion, and discordant action; for it may be truthfully affirmed that that decision has never been deemed satisfactory, but has often been called in question on both sides of the controversy. Other questions here presented have not been settled judicially, but as yet, every Court and Judge is bound to consider and determine for itself, according to its best judgment.

What, then, is to be done? Let the Free States return to their duty, if they have departed from it, and be faithful to the compact, in the true spirit in which it was conceived and adopted. Let the Slave States be content with such an execution of the compact as the framers of it contemplated. Let the federal government return to the exercise of the just powers conferred by the Constitution, and few, very few, will be found to disturb the tranquility of the Nation, or to oppose, by word or deed, the due execution of the laws. But until this is done, I solemnly believe that there will be no peace for the State or the Nation, but that agitation, acrimony and hostility will mark our progress, even if we escape a more dread calamity, which I will not even mention.

However this may be, well knowing the cost, I feel a grateful consciousness of having discharged my duty, and full duty; of having been true to the sovereign rights of my State, which has honored me with its confidence, and to the Constitution of my country, which has blessed me with its protection; and though I may stand alone, I hope I may stand approved of my God, as I know I do of my conscience.

Afterwards a writ of certiorari was applied for, and allowed by the justice, who ordered the discharge, and his return thereto is substantially the same as hereinbefore set forth.

The cause came on for argument before the Supreme Court at the June term, 1854, before a full Bench.

*Byron Paine*, Esq., for the petitioner.

*J. R. Sharpstein*, *Esq.*, *and E. G. Ryan*, Esq., for the respondent.

[The arguments of counsel in this case were long and able, but it is difficult to abreviate them, without materially impairing their force, and the plan of this volume will not permit their insertion at length.]

*By the Court*, WHITON, *C. J.* The questions presented by this record are of great importance. A citizen of this State presented a petition to a justice of this court, setting forth that he was unlawfully deprived of his liberty, and praying that a writ of *habeas corpus* might be issued to bring him before the said justice, together with the cause of his imprisonment, in order that he might be liberated, if, upon investigation, it should be ascertained that his confinement was illegal. The writ was issued and served, and the prisoner brought before the officer; and such proceedings were there had, that the prisoner was discharged. A writ of certiorari was issued to bring the record of these proceedings before this court, in order to correct any error that might have been committed.

The first question that presents itself, is, whether the writ of certiorari can properly issue from this

JUNE TERM
1854.

In re
Sherman M
Booth.

court, in a case like the present. It is contended by the relator (Booth,) that the writ ought not to have been issued, because we have no power to remand him back again to the custody from which he was discharged. But this, if true, would, as the matter appears to us, constitute no objection to our jurisdiction. It would only show that, if we should be of opinion that the relator was improperly discharged, we should not have the power to give entire relief in the premises ; but a simple reversal of the order of discharge, by this court, without remanding the prisoner, would enable the person from whose custody the relator was discharged, to retake his prisoner. The Constitution of this State, (Art. 7, Sec. 3,) gives this court power to issue writs of " Habeas Corpus, Mandamus, Quo warranto, Certiorari, and other original and remedial writs, and to hear and determine the same." We held in the case of the *Attorney General, vs. Blossom,* 1 *Wis. R.* 317, that this power was not granted to the Supreme Court merely to enable it to enforce the jurisdiction conferred upon it in other parts of the Constitution, but, on the contrary, that this clause of the Constitution conferred jurisdiction upon this court to issue the writs mentioned, in all proper cases. It follows that this court has the power to issue any of the writs enumerated, in any case proper for their issue, and to hear and determine them.

It will hardly be contended that this is not a proper case for the exercise of this power. A judicial decision has been had, by force of which a person has been discharged from imprisonment, and those who have an interest in having the imprisonment continued, as public officers or otherwise, and from whose custody he was discharged, have a right to the proper

writ or process to bring the case before this court for
revision. And the writ of certiorari is the proper one
for that purpose. We therefore think that this objec-
tion of the relator is untenable.

The next question presented is, whether a justice of this court has the power to issue, in vacation, a writ of Habeas Corpus, and make it returnable before himself at chambers. It is contended by the plaintiff in error, (Ableman) that as this power is given by the statute, (*Rev. Stat., chap.* 124, *sec.* 3) to "*judges* of the Supreme, Circuit or County Courts" only, a *justice* of this court has no power to issue the writ. The reason given to sustain this position, is, that at the time the act conferring this power was passed, there were no *justices* of the Supreme Court; that the Constitution of the State provided for the election of circuit judges; and that by force of the Constitution they were to be judges of the Supreme Court for five years, and afterwards, until the Legislature should otherwise provide.

It is further urged in support of this position, that the provision in the Constitution providing for the organization of a separate Supreme Court, after the expiration of five years, (if the Legislature should see fit to establish one,) and the organization of the present court by virtue of this provision, show that the justices of the court should do no act which can come before the court for review; it being the intention of the framers of the Constitution and of the Legislature which passed the act regulating the manner in which the writ of Habeas Corpus is to be issued, that the present court should not sit in review upon any decisions made by one of its members; thus avoiding what was thought to be an evil, while the Supreme Court was composed of the circuit judges.

We do not think this objection well taken. The act to provide for the organization of this court, (*Sess. Laws* 1852, *chap.* 395, *sec.* 4) expressly declares that the chief justice and associate justices of this court shall be subject to all the duties and liabilities to which the judges of the former Supreme Court were subject. Among those duties was that of granting writs of Habeas Corpus, when applied for in a proper case ; and we think that we should be guilty of a gross violation of duty, were we to refuse them merely because the case might be reviewed before the whole court. The Legislature have a right to impose any duty upon us as a court, or upon the justices who compose the court, which is not incompatible with the Constitution ; and we do not think that the term " Separate Supreme Court," which is applied to this tribunal, necessarily implies that the justices of the court cannot be empowered by the Legislature to do any act which may come before the whole court.

The next question is, whether the writ ought to have been issued, it appearing from the petition of the relator that he was imprisoned by color of legal process issued by a Commissioner of the United States for the district of Wisconsin. It is insisted by the counsel of the plaintiff in error, that in all cases the general comity of courts which have concurrent jurisdiction, leaves the case to the court whose jurisdiction first attaches, and that such jurisdiction cannot be taken from the court by subsequent proceedings in any other court of concurrent jurisdiction. It is further insisted, that this rule applies on higher grounds to courts of the distinct jurisdiction of the States and the United States, and that the process and proceedings of commissioners form no exception to

this rule, as they are officers of the courts, and recognized as part of the judicial organization of the United States. We do not see how these commissioners can properly be called officers of the *courts* of the United States. It is true that they are appointed by the judges of those courts, but neither the courts nor the judges are responsible for their acts. On the contrary, their duty and power are prescribed with particularity in acts of Congress. The courts have no power to direct them as to the mode in which the duties imposed upon them by law shall be performed, and it seems to us to be a great misuse of language to call them officers of the courts. Nor do we think that they can, with any propriety, be called judicial officers. The *Constitution of the United States*, art. 3, *sec.* 1, provides that " the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the superior and inferior courts, shall hold their office during good behavior, and shall at stated times receive for their services a compensation, which shall not be diminished during their continuance in office." In the case of *Martin vs. Hunter's lessee*, 1 *Wheaton R*. 305, the Supreme Court of the United States say, after quoting this section of the Constitution : " Could Congress create or limit any other tenure of the judicial office? Could they refuse to pay, at stated times, the stipulated salary, or diminish it during the continuance in office ? But one answer can be given to these questions ; it must be in the negative." And again, in the same case : " Congress cannot vest any portion of the judicial power of the United States, except in the courts ordained and established by itself." We there-

fore do not see how these commissioners can be regarded as a part of the judicial organization of the United States. But the position assumed by the counsel for the plaintiff in error, that the court whose jurisdiction first attaches to a case will retain it, notwithstanding that proceedings may be subsequently commenced in other courts of concurrent jurisdiction, is, we think, indisputably correct. It is a familiar principle, and will be denied by no one. But the question arises, whether the facts stated in the petition of the relator for the writ of Habeas Corpus, show such a case.

It will not be denied that the citizens of the State naturally and properly look to their own State tribunals for relief from all kinds of illegal restraint and imprisonment. These courts are clothed with power sufficient for their protection, and would be recreant to their duty were they to refuse to exercise it upon all proper occasions. We do not think the principle contended for by the plaintiff in error applies to a case of this nature.

The petitioner stated, in his petition for the writ, that he was restrained of his liberty by reason of a pretended warrant, a copy of which is annexed to the petition. By that it appears that Winfield Smith, acting as a commissioner of the United States, had, upon an examination of the petitioner for an alleged offence against the laws of the United States, ordered the petitioner to recognize with sufficient sureties in the sum of two thousand dollars, for his appearance at a term of the District Court, to be held at Madison on the first Monday of July then next, and that, in default of the recognizance, the marshal was commanded to deliver him to the common jail, &c. The warrant

recites that the petitioner had been charged on oath "with having, on the eleventh day of March, eighteen hundred and fifty-four, at the city of Milwaukee, in the county of Milwaukee, in said county and district, unlawfully aided, assisted and abetted a person named Joshua Glover, held to service or labor in the State of Missouri, under the laws thereof, and being the property of one Benammi S. Garland, and having escaped therefrom into the State of Wisconsin, to escape from the lawful custody of Charles C. Cotton, a deputy of the marshal of the United States for the district of Wisconsin ; the said Charles C. Cotton having then and there arrested and taken into custody the said Joshua Glover, by virtue of a warrant issued by the judge of the United States for said district, pursuant to the provisions of the act of Congress in that case made and provided, approved September eighteenth, eighteen hundred and fifty."

In order to show that the case is within the principle in question, it must appear that the District Court of the United States had the case pending before it which was made by the issuing and service of the writ of Habeas Corpus ; that the question of the legality of the imprisonment of the petitioner was then pending before that court ; and this the facts in the case do not show. At most, they merely show the case of a person arrested upon a charge of having committed an offence, and an imprisonment in order to compel his appearance before the court which has the power to try him. In such a case, the investigation of the legality of his imprisonment does not necessarily involve an inquiry into the question of the guilt or innocence of the prisoner, nor of his liability to be held to answer for the alleged offence.

Thus, if the imprisonment is by virtue of a warrant issued by a State magistrate, any officer in the State, authorized to issue the writ of Habeas Corpus, may examine into the cause of his imprisonment, and may discharge the prisoner upon his giving bail for his appearance at the proper court, to answer for the offence with which he is charged, if bail has been refused by the magistrate, and the officer who issues the writ of Habeas Corpus should be of opinion that the offence was bailable. So if the magistrate has no authority to imprison. So if the warrant of commitment should set forth no offence, and the commitment should be for that reason irregular, unless proof should be offered with the return of the writ, to show that the prisoner was guilty of an offence. *Rev. Stat.*, *chap.* 124, *sec.* 21. In these cases and many more which might be put, the question of the legality of the imprisonment is investigated without ousting a court of any jurisdiction which it has acquired. Nor do we think the question is changed by the fact that the officer who issued the warrant by virtue of which the petitioner was imprisoned, was an officer of the United States. In many cases the State courts and United States courts have concurrent jurisdiction. In some the jurisdiction of the State courts is exclusive ; and in some that of the United States courts is exclusive. When the jurisdiction is concurrent, the court whose jurisdiction first attaches will retain the case, and the other courts will not interfere, as in no other way can a conflict between the different courts be prevented ; and, of course, when a court has exclusive jurisdiction, no other court can take jurisdiction.

But if the conclusions we have arrived at are correct, the jurisdiction of no court is disturbed by issu-

ing a writ of Habeas Corpus and discharging a pris-
oner who has been committed by an inferior magistrate
for refusing to procure bail for his appearance at
some court, to answer for an alleged offence, or when
bail has been refused and the prisoner is held in custody.

In Sims' case, (7 *Cush. R.* 285) the Supreme Court
of Massachusetts saw no objection, on this account, to
issue a writ of Habeas Corpus to bring before the
court a prisoner in the custody of a marshal of the
United States, under a warrant issued by a commissioner of the United States, though the court refused
the writ for other reasons. See also 7 *Cowen's R.* 471;
10 *Johnson's R.* 328.

It was insisted by the counsel for the plaintiff in
error, that our statute (*Rev. Stat. chap.* 124 *sec.* 28)
interposed an insurmountable objection to the jurisdiction of a State officer in a case like the present,
because it provides that the officer shall, although the
commitment be irregular, remand the prisoner to custody, or hold him to bail, if it appears from the testimony offered with the return that he has been guilty
of an offence.   In such a case it is insisted that the
officer acts as an examining magistrate, whose duties
he cannot discharge if the offence proved is one of
which the United States courts have exclusive jurisdiction.   But we think that whatever difficulties this
section of the statute may create as to the proper
course to be pursued by the officer, in a case of that
description, it should not be construed so as to deprive a State court or officer of the power to issue the
writ in all cases where a citizen of this State is held
in custody on the ground of an alleged violation of a
law of the United States.   The same difficulty would

present itself if a State magistrate should commit a person to prison for refusing to give bail for his appearance at a court of the United States, to answer for an offence against the laws of the United States, under the act of Congress approved September 24th, 1789.

There being no valid objection to issuing the writ and bringing the prisoner before the officer, the question arises, whether the discharge of the prisoner was in accordance with law. The return of the marshal to the writ of Habeas Corpus sets out substantially the same reason for the detention of the prisoner as that stated in the petition for the writ above given, so that there is no necessity for re-stating it. The first objection taken to the return, is that it does not set forth a valid warrant. Upon this subject we fully concur in the opinion of the justice of this court who discharged the prisoner. The warrant fails to state any offence under the act of Congress in question, inasmuch as it does not show for what purpose Joshua Glover, therein named, was in the custody of the deputy of the marshal. He may have been in custody pursuant to the act of Congress approved September 18th, 1850, and not have been arrested as a fugitive from labor. The warrant does not therefore state that the petitioner aided, abetted or assisted a person who was arrested as a fugitive from labor, to escape from custody. This is essential in order to constitute an offence against the act of Congress. We are aware that it is sufficient in a warrant to state the offence, without that particularity required in an indictment; but still there must be at least a general statement of the offence, in order to justify the arrest.

It is further objected to the return of the marshal,

that, admitting Glover to have been arrested as a fugitive from labor, under the act of Congress approved September 18th, 1850, still his arrest was unlawful for the reason that the act is repugnant to the Constitution, and therefore void. And it is contended by the relator that it can be no crime to abet or assist a person to escape from illegal imprisonment, without using force or violence. The principal reasons urged in favor of this position of the relator, are that the Constitution of the United States confers no power upon Congress to legislate upon the subject of the surrender of fugitives from labor; that the act in question attempts to confer judicial power upon commissioners and not upon courts; and that by virtue of the act a person may be deprived of his liberty "without due process of law."

On the other hand, it is contended by the plaintiff in error that these questions are not now open for discussion, as they have all been settled by the Supreme Court of the United States; and that as that court is the only one which has the power to settle finally the question of the constitutionality of an act of Congress, all other courts are bound to acquiesce in its decision. It is not of course claimed by the plaintiff in error that the act of Congress in question has been before that court for consideration, but it is contended that an act passed by Congress February 12th, 1793, (1 *U. S. Stat. at large*, 302) contains provisions not distinguishable in principle from those of the act of September 18th, 1850, and that that court has decided this act to be valid and obligatory. We do not understand that the two acts are in all respects alike in principle, or even similar. The act of 1793 provides for the surrender of fugitives from justice, and also

JUNE TERM
1854.

In re
Sherman M
Booth. of fugitives from labor, and so far as it relates to the latter description of persons, it is similar to the act of 1850. But the two acts differ essentially in the manner in which the surrender is to be effected. By the former, the person to whom the service or labor was due, was authorized to seize or arrest the fugitive, and to take him before any judge of the circuit or district court of the United States, residing or being within the State, or before any magistrate of a county, city or town corporate wherein such seizure or arrest was made, and upon proof to the satisfaction of such judge or magistrate, either by oral testimony or affidavit taken and certified by a magistrate of any such State or Territory, that the person so seized owed service or labor under the laws of the State from which such fugitive fled, to the claimant, it became the duty of the judge or magistrate to give a certificate thereof to the claimant, his agent or attorney, which was sufficient warrant for the removal of the fugitive to the State or Territory from which he escaped. It will be observed that the alleged fugitive was to be taken before some judge of the Circuit or District Court of the United States, or before some State magistrate, who decided upon the question of the surrender of the fugitive to the claimant, upon proof to be submitted to him. He had the power to weigh the testimony and to decide upon its sufficiency. The act of September 18th, 1850, differs from that of 1793 in two essential particulars. By the former certain officers called commissioners are authorized to make the surrender and give the certificate, and the testimony to show the fact that the alleged fugitive owes service or labor, and that he has escaped, is not to be weighed by the commissioner, but has an effect given to it by the act,

independent entirely of the opinion of the commissioner in regard to its sufficiency. The tenth section of the act provides that when any person held to service or labor in any State or Territory, or in the District of Columbia, shall escape therefrom, the party to whom such service or labor shall be due, or his agent or attorney, may apply to any court of record therein, or judge thereof in vacation, and make satisfactory proof to such court, or judge in vacation, of the escape aforesaid, and that the person escaping owed service or labor to such party. Whereupon the court shall cause a record to be made of the matter so proved, and also a general description of the person so escaping, with such convenient certainty as may be, and a transcript of such record authenticated by the attestation of the clerk and of the seal of said court, being produced in any other State, Territory or district in which the person so escaping may be found, and being exhibited to any judge, commissioner or other officer authorized by the law of the United States to cause persons escaping from service or labor to be delivered up, shall be held and taken to be full and conclusive evidence of the fact of escape, and that the service or labor of the person escaping is due to the party in such record mentioned.

It can hardly be claimed, we think, that any adjudication upon the act of 1793 could decide all the questions involved in the act of 1850. But we will examine the cases referred to by the counsel for the plaintiff in error, upon this point. The act of 1793 received a very elaborate examination in the case of *Prigg vs. Commonwealth of Pennsylvania*, 16 *Peters R.* 640. The question, however, involved in the record before the court, was simply whether Prigg, the

plaintiff, had the right to seize without process in the State of Pennsylvania Margaret Morgan, a fugitive slave, and remove her to the State of Maryland, from which she had escaped, contrary to the statute of the former State. The decision of the court was, that he had the power, and the court reversed the judgment of the Supreme Court of Pennsylvania, which had affirmed the judgment of the court in which Prigg was convicted. The principal question discussed by the justices of the court who gave opinions, was, the power of Congress to legislate upon the subject of the reclamation of fugitives from labor; and they were all of opinion that Congress had the power; a majority holding that the power was exclusive, and that the State could not pass laws even in aid of the legislation of Congress. In the course of this discussion nothing was said in relation to the powers of commissioners, for those officers did not exist at the time when the act of Congress was passed; nor of the right of the alleged fugitive to a trial by jury to decide the question of fact upon which his surrender depends. In the case of *Jones vs. Van Zandt*, 5 *How. R.* 215, the act of 1793 came again before the court for its consideration; and in the course of the opinion given in that case, the court says: " This court has already, after much deliberation, decided that the act of February 12th, 1793, was not repugnant to the Constitution. The reasons for their opinion are fully explained by Justice Story in *Prigg vs. Penn.*, 16 *Peters* 611."

In the case of *Moore vs. Illinois*, 14 *How. R.* 13, the court states what was decided in the case of *Prigg vs. Penn.*, and among the questions to be decided in that case was this: " That the government is clothed with appropriate authority and functions to enforce

the delivery (of fugitive slaves) on claim of the owner, and has properly exercised it in the act of Congress of February 12th, 1793." These are all the cases which we have been able to find where the act of 1793 has come before the Supreme Court of the United States for review, and in none of them is the question of the power of commissioners to give the certificate to the claimant which authorizes the removal of the fugitive, discussed or decided.

These cases are equally silent upon the question (a most important one) raised in this case, as to the right of a person claimed as a fugitive from labor to have the facts, which must be proved before he can be surrendered to the claimant, tried and decided by a jury. It is true that the act of 1793 provides for the surrender of the person claimed as a fugitive, without such a trial and decision, and it is said in substance by the Supreme Court of the United States, in the cases of *Jones vs. Van Zandt* and *Moore vs. Illinois*, that the court did decide in the case of *Prigg vs. Penn.* that the act of February 12th, 1793, was constitutional. But upon looking at that case, we find that the question of a trial by jury to determine the facts of the case, was not raised by the record and was not discussed by the court in giving its opinion. We think it would be most unjust to that court to hold that it has decided questions which its judges have not even discussed, and which have not even been before it for adjudication.

We are of opinion, therefore, that, whatever may be the duty of this court in relation to the question of the power of Congress to provide by law for the surrender of fugitives from labor to the persons to whom their labor is due, we are not at liberty to con-

*Margin:* June Term 1854. In re Sherman M Booth.

sider the question of the right of a person claimed as a fugitive to a trial by jury before he can be surrendered or delivered up to the claimant, as already settled by the court which has the power finally to decide all questions growing out of an alleged violation of the Constitution of the United States by an act of Congress. We must consider the question as an open one.

It becomes, therefore, our duty to decide whether so much of the act of Congress of September 18th, 1850, as provides that certain officers called commissioners shall decide the questions of fact which must be proved, before the surrender of the alleged fugitive can take place, is valid and obligatory. We think that we are also called upon to decide whether the proceedings provided for in the act for establishing judicially the fact of the escape of the alleged fugitive and the fact that he owes service or labor, are in conformity with the Constitution of the United States. These questions are most grave and important; we would, that we could avoid them; but they are forced upon us, and we are not at liberty to refuse to consider them.

We are of opinion that so much of the act of Congress in question, as refers to the commissioners for decision, the questions of fact which are to be established by evidence before the alleged fugitive can be delivered up to the claimant, is repugnant to the Constitution of the United States, and therefore void for two reasons: First, because it attempts to confer upon those officers judicial powers; and second, because it is a denial of the right of the alleged fugitive to have those questions tried and decided by a jury, which we think is given him by the Constitution of the United

States. We have referred to the case of *Martin vs.*
*Hunter's Lessees*, 1 *Wheaton* 305, and to article 3
section 1 of the Constitution of the United States, to
show that Congress cannot vest any judicial power
under the Constitution except in the courts provided
for in the clause of the Constitution referred to. We
are aware that Congress has established courts in the
various Territories, and has provided for the appoint-
ment of judges with a different tenure of office from
that fixed by the Constitution ; but the power to ap-
point these judges is supposed to be derived from
article 4 section 2 of the Constitution, which provides
that " Congress shall have power to dispose of and
make all needful rules and regulations respecting the
territory or other property of the United States."

But, however this may be, we are not aware that
the authority to vest any portion of the judicial power
in any tribunals created by itself, except those men-
tioned in section 1 of article 3 of the Constitution, is
claimed for Congress by any one, save in the single
instance of judicial officers for the Territories belong-
ing to the United States, and for the District of Co-
umbia. We think that the duties performed by the
commissioners, under the act in question, are judicial
in their character ; as clearly so as those performed
by a judge in the ordinary administration of justice.
He is obliged to decide upon the questions presented,
judicially, and to give a certificate to the person claim-
ing the alleged fugitive, which authorizes his trans-
portation to the State from whence he is alleged to
have escaped, or withhold it, as he shall think proper
in view of the evidence submitted for his considera-
tion. It is true that the act, by providing that the
record made in the State from whence the alleged

6

JUNE TERM 1851.

In re
Sherman M
Booth.

fugitive may have escaped, shall be conclusive evi-dence of the escape, and of the fact that the person claimed owes service or labor to the claimant, mate-rially lessens the labor of the commissioner; but this does not alter the nature of the act which he performs: it must be regarded as a judicial determination of the matter submitted to him. We are therefore of opin-ion that the act under consideration, by attempting to vest judicial power in officers created by Congress and unknown to the Constitution, is repugnant to that instrument, and for that reason void.

And we think it equally clear that the Constitution is violated by withholding from the person claimed, the right to a trial by jury before he can be delivered up to the claimant.

The fifth article of amendments to the Constitution of the United States provides, among other things, that "no person shall be deprived of life, liberty or property, without due process of law." Chancellor Kent in his commentaries (2 *Kent. Com.* 3) says: "It may be received as a self-evident proposition, univer-sally understood and acknowledged throughout this country, that no person can be taken or imprisoned, or disseized of his freehold, or liberties or estate, or exiled, or condemned, or deprived of life, liberty or property, unless by the law of the land, or the judg-ment of his peers.

"The words 'law of the land,' as used in Magna Charta in reference to this subject, are understood to mean due process of law; that is, by indictment or presentment of good and lawful men; and this, says Lord Coke, is the true sense and exposition of these words."

June Term 1854.

In re Sherman M Booth.

We are aware that it has been said that slaves are not persons in the sense in which that term is used in the amendment to the Constitution above referred to. But this, admitting it to be true, does not affect the question under consideration, as persons who are free are liable to be arrested and deprived of their liberty by virtue of this act, without having had a trial by a jury of their peers. We do not propose to discuss the question whether a slave escaping from the State where he is held to service or labor, into a State where slavery does not exist, thereby becomes free by virtue of the local law, subject only to be delivered up to be returned again to servitude, as it is a question not necessarily involved in the consideration of the subject before us. But we propose to examine the operation of the act upon a free citizen of a free State, and to show that by it such a person may be deprived of his liberty without "due process of law." It will be observed that the claimant can go before any court of record, or any judge thereof, in vacation, and make satisfactory proof to such court or judge, in vacation, of the escape, and that the person escaping owes service or labor to such party. It then becomes the duty of the court to cause a record to be made of the matters so proved, and also a description of the person escaping, and such record being exhibited to any judge, commissioner or other officer authorized by law to cause persons escaping from service or labor to be delivered up, shall be held and taken to be conclusive evidence of the fact of escape, and that the service or labor of the person escaping is due to the party in such record mentioned. This testimony is taken, and this record is made, in the absence of the person to be affected by the proceeding. He has no

opportunity to cross-examine the witnesses who depose to the facts which are thus conclusively proved; but without his knowledge, evidence is manufactured, which, by virtue of this act, proves beyond question that he is a slave and that he has escaped from servitude. We are at a loss to perceive how this proceeding, by virtue of which a freeman becomes a slave, can be justly called "due process of law," in the sense in which that language is used in the Constitution. We are aware that it has been said that the proceedings before the commissioner do not determine the question of freedom or slavery, that the fugitive is only sent back to the State from which he is alleged to have escaped, and that when he reaches there he is a freeman or a slave as his *status* shall be determined by the local law. It is further said that these proceedings are analogous to those by which the fugitive from justice is delivered up to be taken to the State from which he has escaped; that a person may be arrested by virtue merely of an indictment or an affidavit made before a magistrate, charging him with treason, felony or other crime committed in some other State, and that upon the production of a copy of the indictment or affidavit certified as authentic by the governor or chief magistrate of the State or Territory from which he fled, he shall be delivered up to be taken back. It is said that as this proceeding does not deprive the person of his liberty in the sense in which that term is used in the Constitution, but merely delivers him up to be taken to the State where, according to the indictment or affidavit, the offence was committed, to be dealt with according to the local law, so, neither do these proceedings accomplish more than the mere transfer of the alleged fugitive

to the State where, as is claimed, he owes service or labor by force of the local law. We think this is a mistaken view of the question. The fugitive from justice is delivered to an agent appointed by the governor of the State where the offence is alleged to have been committed, without any adjudication upon the question of his guilt or innocence; in other words, he is delivered to the officer of the law, and is in the custody of the law for the purpose of being taken to the State where alone he can be tried for the alleged offence. But the case is very different with the alleged fugitive from labor. In his case there is an adjudication before the commissioner that he owes service or labor, and that he has escaped. By force of the act of Congress under consideration, the record made in the State from which he is said to have escaped is conclusive evidence that his *status* is that of a slave.

The commissioner is obliged, if his identity is proved, so to adjudge, and the certificate which is given to the claimant is given because the commissioner has so adjudged. Moreover, the commissioner can only give the certificate to the claimant, who must be the person to whom the labor or service is due, his agent or attorney, and it is given to him for that reason. It is not material to enquire what the condition of the person will be when he has been taken to the State where the service or labor is said to be due. He may regain his freedom, but if he does, it will be by force of the law of the State, and not by virtue of the act of Congress under consideration; for under that he has been adjudged a slave, and by force of it he has been taken as a slave by the person adjudged to be his owner, his agent or attorney, from the State where he was arrested, to the State from which he is alleged

to have escaped. We are therefore obliged to conclude that the alleged fugitive from labor is taken back to the State from which he is said to have escaped, as a person who has been proved and adjudged to be a slave, and, as we believe, without due process of law, without having his rights passed upon and determined by a jury of his peers. We think it essential that his right should be maintained by all courts and all tribunals, and for the reasons above given we must affirm the order made in this case, discharging the relator.

CRAWFORD, *Justice, dissenting*. Inasmuch as I cannot concur with my brethren upon all of the points embraced in the opinion which has just been delivered by the Chief Justice, I feel called upon to designate in writing the points upon which I dissent.

That either of the justices of this court has authority to grant the writ of Habeas Corpus when a propper case for the issuing of the writ is laid before him by petition, I do not entertain any doubt; but whether the mandate of either of us in the form used in this case, and authenticated or tested only by the sign manual of the justice granting or allowing it, without the signature of the clerk, or the seal of a court, is such a writ as is contemplated by the statute, (*chap.* 124, *secs.* 6, 7, 41 *and* 42,) is not made a question in the present case, and may be of no importance here.

I agree with my brethren that the proceeding upon the return of the writ, and the decision arrived at by the justice before whom the hearing has taken place at chambers, may be reviewed in this court by means of a writ of certiorari.

I also concur in the opinion that when a writ of Habeas Corpus *cum causa* has been granted or allowed, and issued, directed to any person within the territo- rial limits of this State, enjoying the protection of our Constitution and laws, and amenable to them, the exigency of that writ must be obeyed, and a return to the writ enforced, whether the person to whom the writ has been directed be the marshal of the United States or not; and the reasons for this conclusion, as presented by the Chief Justice, are entirely satisfactory to me.

I also believe, with the majority of the court, that when a writ of Habeas Corpus *cum causa* has been directed to the Marshal of the United States, and he has by his return thereto set forth a writ or process, by virtue of and in obedience to which he claims to detain the person by whom or in whose behalf the writ of Habeas Corpus has been applied for, it is within the province of the State court or magistrate before whom the hearing is had, to look into the process by which the marshal justifies the detention, so far as may be necessary to enable the court or officer to determine whether the process is such as might have been issued by the tribunal from which it emanated, and whether that tribunal had jurisdiction of the subject matter or offence set up in the warrant or process, but beyond this I cannot go. That we are authorized to examine into the nature of the process for this purpose, must, I think, be obvious, because without such an inquiry we could not determine whether really there be a warrant, or writ, or not; and the bare return by the marshal that he detains by virtue of a process, would not be a compliance with section ten of our Habeus Corpus act, without

setting forth a copy of the process. And that our Legislature so viewed the power of the court, or officer before whom a Habeas Corpus case might be heard, is apparent from the first subdivision of section eighteen of the chapter, which directs that the party shall be remanded, if it shall appear that he is detained "by virtue of process issued by any court or judge of the United States, in a case where such court or judge has exclusive jurisdiction." How otherwise than by looking into the process and examining its nature, could it be ascertained and determined whether it were, in fact, process issued by a federal authority, or whether the case or matter in which it issued were exclusively within the jurisdiction of the federal court or judge? But when the inquiry into the process is carried thus far, and it is discovered that it is a valid process, of the issuing of which the federal court or officer had jurisdiction, and that the subject matter, or offence named therein, is within the control or jurisdiction of the court or officer issuing it, then, I believe, a just and proper regard for the laws of the general government, and for the due administration of them in their own courts, demands that the State court or officer should decline to proceed any farther, and refer the applicant to the federal court for the relief which he seeks.

In pursuing this course, I do not perceive that the State tribunals yield anything which may be properly included in their rights or independence ; but, on the contrary, they thereby evince a desire to preserve a clear distinction between subjects over which the federal courts have jurisdiction, *and are in the exercise thereof,* and subjects beyond the jurisdiction of the federal courts, and over which the State tribunals have

June Term
1854.

In re
Sherman M
Booth.

the exclusive control. Nor can I see how the person whose liberty is invaded by color of process, is deprived of the writ of Habeas Corpus, if, indeed, his case be one in which that writ ought to be allowed, because the courts and judges of the United States are as fully empowered to allow such writ, where the detention or imprisonment is found in a case within their jurisdiction, as are the courts of the State. ( *Vide* *Sergt. Const. Law, chap.* 28, and cases there cited.)

But the question of greatest moment, and a decision or opinion upon which is most desired in this case, relates to the constitutional power of Congress to enact the law of 1850, chapter 60, commonly known as the Fugitive Slave Law.

It has been zealously and ably urged at the bar, by the counsel for the petitioner, that the Constitution of the United States vests no power, either expressly or by implication, in Congress, to legislate upon the subject of the reclamation of fugitives from labor or service, but that the power of legislation upon this subject belongs 'exclusively to the States, and that the clause in the Constitution of the United States concerning fugitives from labor, amounts only to a compact obligatory upon the several States, but grants no power to Congress. This is the view of the subject taken by my brother Smith, before whom the case was heard at chambers, who held the law in question to be unconstitutional and void, for several reasons.

The counsel for the respondent has, with marked ability, met and contended against the objections to the validity of this law ; and from all the information which I have derived from the lengthy arguments in the present case, from the nature and history of the clause in the Constitution of the United States, in pur-

June Term
1854.

In re
Sherman M
Booth.

suance whereof the law was enacted by Congress, as well as from an examination into the several cases reported in the federal and State courts in which this precise question has been adjudicated, I am satisfied that Congress has the constitutional power to legislate upon the subject of fugitives from service or labor, in order to give effect to the third clause of section two of article four of the Constitution of the United States. If this were a new question, and I did not feel the control of former adjudications by tribunals composed of men of the most eminent endowments, I would incline to the belief that the power to legislate upon this subject, while it belonged to Congress in virtue of the Constitution, might be properly exercised by the several States. In other words, that the power is concurrent, and so long as the State legislation is not repugnant to or inconsistent with the provisions made by Congress, it is permissible. This is, I think, a necessary conclusion from the language of the Constitution itself, where it declares that the fugitive " shall be delivered up on the claim of the party to whom such service or labor may be due." The injunction thus imposed upon the States is no less obligatory upon them than is any other provision contained in their respective Constitutions, because the Constitution of the United States, in all its provisions, is not only a component part of the law of each of the States, but is really the supreme law. I acknowledge that when Congress has acted upon the subject, their action, so far as it goes, must necessarily be exclusive ; but I am unable to appreciate the reasoning by which the several States should be precluded from legislating in aid of the provisions made by Congress, so long as their legislation does not in any

respect impede or conflict with the enactment of Congress.

In *Houston vs. Moose*, (5 *Wheat.* 48,) Mr. Justice Story, in speaking of the grant of powers to Congress by the Constitution, says : "A reasonable interpretation of that instrument necessarily leads to the conclusion that the powers so granted are never exclusive of similar powers existing in the States, except where the Constitution has, in express terms, given an exclusive power to Congress, or the exercise of a like power is prohibited to the States." He then proceeds to enumerate three classes of cases or instances in which the power of Congress is exclusive, and proceeds thus : " In all other cases not falling within the classes already mentioned, it seems unquestionable that the States retain concurrent authority with Congress, not only under the eleventh amendment of the Constitution, but upon the soundest principles of general reasoning. There is this reserve, however, that in cases of concurrent authority, *where the laws of the State and of the Union are in direct and manifest collision on the same subject, those of the Union, being the Supreme law of the land, are of paramount authority, and the State laws, so far, and so far only, as such incompatibility exists, must necessarily yield."*

But upon this subject I do not feel at liberty to advance reasoning or authority, because it has received the critical examination of many of the greatest and most profound judges who have adorned the courts of this Union ; whose opinions and decisions are usually received by us upon all legal questions as satisfactory if not conclusive authority, and especially so because the question has been authoritatively decided by the Supreme Court of the United States, the last

and final constitutional exponent. Upon this, as upon all other questions arising out of the Constitution of the United States, or the laws of Congress, I am bound to yield obedience to the decisions of that tribunal, for upon such questions we are *subordinate.*

We are accustomed on most of the subjects mooted and discussed in this as in other courts of law, to consult the decisions of other co-ordinate courts upon the same or kindred subjects, and in relation to the constitutionality of congressional action upon the clause concerning fugitives from service or labor, I deem it not inappropriate to refer to several cases in which the power of Congress to legislate upon the subject has either been tacitly or expressly recognized or avowed and maintained. It may be remarked here that for the purpose of the present case, it is not important whether the power under the Constitution vests in Congress alone, or in the several States concurrently with Congress, inasmuch as the Legislature of this State has never acted on the matter.

The case of *Glen vs. Hodges,* (9 *John.* 67) was before the Supreme Court of New York in 1812. It was an action of trespass *vi et armis,* for seizing and taking the plaintiff's negro slave from the possession of the agent of the plaintiff in the State of Vermont, where he had been secured as a fugitive from service. The validity of the act of Congress of February 12, 1793, was not questioned, and the court in their opinion refer to the act, without suggesting a doubt of its constitutionality.

In 1816, in the case of *The Commonwealth vs. Holloway,* (2 *Serg. and R.* 305) which was a Habeas Corpus returnable in the Supreme Court of Pennsylvania, sued out to procure the liberation of a female

negro child born in Pennsylvania, but the issue of a fugitive slave, the court contemplate the act of 1793 as a valid law. Soon afterwards, in 1819, the same court, in *Wright alias Hall vs. Deacon*, (5 *Serg. and R.* 62) recognized the act of 1793 as a valid one.

In the State of Massachusetts the constitutionality of the law in question was made a point in 1823, in the case of *The Commonwealth vs. Griffith*, (2 *Pick.* 11) and the justices of the Supreme Court of that State were unanimously of opinion that the law was constitutional, although Mr. Justice Thatcher insisted that the fugitive should be seized by the process of law of the State where he is found. So also in 1836, in the case of *The Commonwealth vs. Aves*, (18 *Pick.* 139) the same court treat the act of 1793 as enacted in pursuance of the Constitution ; and as late as 1851, in the celebrated *Thomas Sims* case, (7 *Cush.* 285) the constitutionality of the fugitive law of 1850, the law to which objections are made in the case now before us, the Supreme Court of Massachusetts, after a very elaborate argument and examination of the question, again affirmed the power of Congress to legislate upon the subject of fugitives from labor or service, and without a word of dissent from any member of that learned bench, declared the act of 1850 to be a constitutional enactment.

Another case in which the power of Congress to legislate upon this subject, and the validity of the act of 1793 were denied in argument, is the case of *Jack, a negro man, vs. Martin*, (12 *Wend.* 311) where, in a very lengthy opinion of the Supreme Court of New York, as given by Mr. Justice Nelson, the act is held to be constitutional and valid.

JUNE TERM 1854.

In re Sherman M Booth.

I have thus adverted to several cases in the courts of other States, in which the constitutional power of Congress to act upon the subject embraced within the third clause of section two of article four of the Constitution of the United States is recognized, and I have done so because the proverbial wisdom and purity of the men who composed those courts have taught us all to look to their opinions for instruction upon every subject connected with the science of the law. But I freely admit that we are not *bound* to pursue the same mode of argument, nor to arrive at the same conclusions that these courts have pursued or arrived at, except so far as we deem them consistent with sound reason; yet I can hardly conceive it possible that a question of so delicate and important a nature as the one now before us, could have occupied the attention of those tribunals without eliciting a thorough examination, and precluding mistake. It is not important, however, to inquire how far the adjudications of the courts of our sister States ought to influence or control our decision on this point, inasmuch as I have already said the decisions of the Supreme Court of the United States have settled the question; and until that court shall find occasion to review and change its own view of the subject, it is neither becoming nor proper on my part to disobey the official requirements involved in the decisions of that court, or to test their correctness by a recurrence to the history of the times or events which produced the constitutional provision, or the intention of the framers of the Constitution, and the rules of interpretation by which it should be construed.

In *Prigg vs. The Commonwealth of Penn.*, (16 *Peters* 539) the constitutionality of the act of 1793,

JUNE TERM
1854.

In re
Sherman M
Booth.

concerning fugitives, so far as it related to fugitives from service or labor, was presented for decision to the Supreme Court of the United States; and if ever there was a cause thoroughly and ably discussed by counsel on both sides, and calmly and elaborately examined by the court, that is the cause.  The best professional talent which could be furnished by the States of Pennsylvania and Maryland was enlisted in the argument; and the opinion of the court, sustaining the constitutionality of the act of Congress, was given by the very man who has furnished to the profession our most valued work on the Constitution of the United States.  This decision, so far as it asserted the power of Congress over the subject, was concurred in by every member of the court, although in relation to other points, and in regard to the mode of reasoning adopted by Judge Story, several of the judges dissented.

Five years afterwards, in the case of *Wharton Jones vs. John Van Zandt,* (5 *Howard,* 215) the question was again urged in the same court, and Mr. Justice Woodbury, in delivering the opinion of the court, disposes of the point whether the act of '93 was repugnant to the Constitution, by saying, after a few remarks upon the subject: " That this act of Congress, then, is not repugnant to the Constitution, must be considered as among the settled adjudications of this court."    And again, in *Moore vs. the People of the State of Illinois* (14 *Howard,* 13) the doctrine of the case of *Prigg vs. the Commonwealth of Pennsylvania,* is reiterated, and declared to be " that the government is clothed with appropriate authority and functions to enforce the delivery or claim of the

owner, and has properly exercised it in the act of Congress of 12th February, 1793."

From these decisions I am led to view the subject as definitely settled, and the maxim *stare decisis*, as entirely applicable. I understand the Chief Justice to feel himself concluded by these decisions, so far as they declare the act of 1793 to have been the exercise of a constitutional power by Congress to legislate, but that because they do not settle the question, whether the fugitive slave is entitled to a trial by jury, of the State where he is seized, and, because the act of 1850 confers certain powers on Commissioners appointed by the federal courts, which are claimed to be judicial, the constitutionality whereof has not been determined by the Supreme Court of the United States, he is at liberty to inquire upon these points, whether the act of 1850 is obnoxious to the Constitution.

The force of argument which has been brought to bear, as well against as in favor of the constitutionality of the act of 1850 in respect to these questions, has, I confess, raised doubts, in my mind, but it has failed to produce that conviction which should justify a court, or Judge, to pronounce a legal enactment void, because unconstitutional, and I am therefore unable to concur in the opinion that this law is unconstitutional.

I shall briefly state my views upon these questions. The fourth section of the act of Congress of September 18, 1840, provided that certain Commissioners appointed by the federal and territorial courts, shall have concurrent jurisdiction with the Judges of the Circuit and District Courts of the United States in their respective circuits and districts within the several States, and the Judges of the superior courts

of the territories, severally and collectively, in term-time and vacation, and shall grant certificates to such claimants upon satisfactory proof being made, with authority to take and remove such fugitive from service or labor under the restrictions herein contained, to the State or Territory from which such persons may have escaped or fled." To my mind, the granting of these certificates, " upon satisfactory proof being made," looks very like the exercise of judicia functions, because, although the granting of the certificate is merely a ministerial act, yet the determination upon the sufficiency of the proof would seem to involve judicial power. And in this connection it is urged, that Congress cannot confer judicial power otherwise than in accordance with section one of article three, of the Constitution of the United States, which contemplates courts only, the judges of which shall hold their offices during good behavior, and shall from time to time receive a compensation or salary for their services. Now it is evident that these Commissioners are not judges, nor can they hold or compose *courts* within the meaning of this section of the Constitution, for they hold their appointment at the will of the court appointing them, and are not liable to impeachment. But the judges of several of the Territories of the United States, who hold their appointment from the President, are not appointed to hold during good behavior ; and, if I am not mistaken, there is no instance of their having been held liable to impeachment—at least that they are not so liable, has been advanced by an Attorney General of the United States.

It is said, territorial judges are appointed under the power given to Congress by the second clause of

June Term 1854.

In re Sherman M Booth. section three of article four of the Constitution, on the ground that the establishment of a judiciary for the territories is a necessary incident to the acquisition of territory, and the power to make all useful rules and regulations for those territories : but if the power to legislate upon the subject of fugitives from labor be vested in Congress, it would seem that the performance of judicial acts might be vested in other than judges or courts, under the constitutional provision (article three, section one,) in such a case, as in the case of newly organized territories.

But it has been repeatedly held, that where, by an act of Congress, State courts or magistrates are authorized to perform acts of a judicial character arising out of the acts of Congress, they may lawfully do so if not prohibited by the State law.

Now if judicial power can be conferred by Congress upon others than courts or judicial officers known to the Constitution, it seems to me that it can make little difference whether the power be vested in a State court or officer, or in a commissioner or officer of the United States who is not a judicial officer. In either case the power is vested in a tribunal or officer, not a court or judge, contemplated by the clause of the Constitution referred to.

But there certainly is a degree of force in the objection that the power to hear and determine complaints and summary applications, which may and often do involve important rights of personal liberty, and require the exercise of much professional experience and wisdom, ought not to be vested in the class of officers who are known as commissioners of the federal courts, who hold their office at the pleasure of the courts ; and although in many instances gen-

tlemen of acknowledged ability fill these offices, yet
this of itself affords no complete answer to the objec-
tion.

Without further remark on this point, I proceed to
the question of the right of the alleged fugitive to
have the fact of owing service or labor ascertained by
the verdict of a jury.

The right of trial by jury is highly and justly
esteemed, and is expressly protected and preserved
by our State Constitution; and it cannot be denied
that this right extends to all persons within the State,
regardless of color, and to the fugitive from labor
or slavery as to the freeman, in all that relates to or
affects his life, liberty or property, subject to the sev-
eral provisions of the Constitution of the United
States. But suppose that a demand by the executive
of any other of the States of this Union upon the
Governor of this State has been made, to surrender
any citizen, whether he be white or black, upon a
charge of felony committed in the State from which
the requisition comes. It may be that, as in the case
of an unfounded claim upon the labor and service of
the alleged fugitive slave, the person demanded as a
fugitive from justice ought not to be delivered over;
and yet if the requisition be in due form of law, and
accompanied by the proper evidence that the per
son is charged with the offence, the right of trial of
the fact is not afforded to him here, but he is appre-
hended, deprived of his liberty, and transported to
another and perhaps a distant State for trial. Could
this be done except by virtue of a provision of the
Constitution, or a treaty? There would seem to be
no real difference between the demand of a fugitive

June Term
1854.

In re
Sherman M
Booth.

from justice, and the claim of a party to whom it is alleged labor or service is due.

In either case there is a deprivation of personal liberty without the intervention of a jury, but it is considered essential to the complete enforcement and fulfillment of the constitutional compact, that a temporary deprivation should be permitted in the individual case, in order that the constitutional right may be secured. It is true, that in the case of a fugitive from justice, he is given into the custody of the officers of justice, with the beneficent presumption of the law in favor of his innocence, until he shall have been duly convicted ; while in the case of the fugitive from labor, he is placed under the control of his claimant, to be carried back to the State from which he is charged to have fled, with no presumption in favor of his freedom ; but this is, I think, more an argument against the policy and justice and humanity of the law, than against its constitutionality. A case might arise where, by false swearing and conspiracy, a freeman, by the machinery of this law, might be snatched from his liberty and reduced to the condition of slavery, until, by a suitable proceeding, he asserted and obtained his freedom ; but so, also, by similar means, an innocent man may be carried away charged with crime, and placed under the necessity of vindicating his innocence in a distant State.

Upon the provisions of the Constitution concerning fugitives of both kinds, Judge Story, in his *Commentaries on the Constitution, p.* 677, *sec.* 1806, says : " It is obvious that these provisions for the arrest and removal of fugitives of both classes, contemplate summary ministerial proceedings, and not the ordinary

June Term 1854:

In re Sherman M Booth.

course of judicial investigations, to ascertain whether the complaint be well founded or the claim of ownership be established beyond all legal controversy. In cases of suspected crimes, the guilt or innocence of the party is to be made out at his trial, and not upon the preliminary inquiry whether he shall be delivered up. All that would seem in such cases to be necessary, is that there should be *prima facie* evidence before the executive authority to satisfy its judgment that there is probable cause to believe the party guilty, such as upon an ordinary warrant would justify his commitment for trial. And in the cases of fugitive slaves, there would seem to be the same necessity of requiring only *prima facie* proofs of ownership, without putting the party to a formal assertion of his rights by a suit at law. Congress appears to have acted upon this opinion, and accordingly, in the statute upon this subject, have authorized summary proceedings before a magistrate upon which he may grant a warrant for a removal."

In *Sergeant's Constitutional Law, chap.* 33, *p.* 398, it is said : "From the whole scope and tenor of the Constitution and act of Congress, it appears that this fugitive is to be delivered up on a summary proceeding without the delay of a formal trial in a court of common law."

Assuming that the framers of the Constitution had in view the cases of fugitive slaves only, and that their object was to secure the delivering up of such fugitives *on claim* of the owner or person to whom the labor is due, it would seem obvious that if a trial by jury may be insisted upon, the determination of the question might be protracted in various ways so as to defeat the very object of the Constitutional provision.

June Term
1854.

In re
Sherman M
Booth.

As I have before remarked, this, as well as the preceding point which I have adverted to, has occupied my serious attention, because they involve vital and important principles of no ordinary interest to the people of this Union. That the priceless benefits of freedom should be surrounded by every safeguard, and protected from encroachment or invasion, every man worthy to enjoy its blessings must admit ; and in every relation of life we ought to contribute not only to the preservation, but to the extension of those blessings. But I am fully sensible that the duty of a judicial officer is to expound the law, not to make it, and to observe the distinction between the strict performance of what he may deem an imperative official duty, and the assertion of his rights and privileges as a citizen in the advocacy of measures which he may consider essential to the welfare or happiness of his country and his fellow-men.

There is one point in this case, and, in my judgment, the only point essential to the disposition of the case; and it is that which relates to the validity of the commitment or process by virtue of which the petitioner was detained by the United States marshal. It sets forth that at a certain time and place, in this State, the petitioner, Booth, unlawfully aided and assisted one Glover, held to service, &c., in the State of Missouri, under the laws thereof, being the property of one Garland, and having escaped from such service into this State, to escape from the lawful custody of the deputy marshal of the United States for the district of Wisconsin, who had then and there taken said Glover into his custody by virtue of a warrant issued by the judge of the United States for the said

district, pursuant to the act of Congress of September <span>JUNE TERM<br>1854.</span> 18th, 1850.

It does not appear from this process that Glover <span>In re<br>Sherman M<br>Booth.</span> was committed to the custody of Mr. Cotton, the deputy marshal, upon claim of any person whatever, and for anything that appears, this same Glover may have been committed by the district judge for some offence against the United States ; but the facts set forth in the process would not, in my judgment, constitute an offence within the twenty-second section of the act of Congress of 1790. The seventh section of the act of September 18th, 1850, makes it an offence to aid or assist a person who has, upon a proceeding under that act, been placed in the custody of a person legally authorized to detain him ; but the process in this case does not show that Glover was so detained. He may have been a fugitive from labor, and yet he may not have been claimed, and if so, the aiding in his escape would not have been an offence under the act of 1850. I shall not pursue the subject farther, but shall rest content by saying that I concur with my brethren in holding the petitioner entitled to be discharged, because the commitment sets forth no just cause of detention.

SMITH, J.[*] When this case was originally before me, I gave to the questions involved in it all the investigation which the means then within my reach would permit. The conclusions to which I then arrived

---

[*] NOTE.—This opinion was delivered verbally, from short notes, at the same time that the other judges delivered theirs, substantially as it here appears, and has since been written out at length and prepared for publication with the report of the case.

June Term 1854.

In re
Sherman M
Booth.

have been made, and rightfully made, the subject of criticism and investigation. In addition to what I then said, I have now to remark that there are some principles involved in this case not noticed in my former opinion, which seem to require attention ; and some doctrines have been advanced at the bar, which, in my judgment, ought not to be passed over in silence. A question of the last importance to the States and people is here brought directly under judicial cognizance, and comprehends the principal elements in the theory of our complex system of government.

One great aim of the founders of our government, (among others,) was, to secure beyond contingency personal liberty, and to protect and preserve, as far as practicable, the independence and sovereignty of the respective States, (without whose agency such personal liberty could not be protected and secured) as far as was consistent with the practical efficiency of the federal government about to be organized. A mere glance at the history of the times, at the debates in the national convention that framed, and of the respective State conventions which adopted the Constitution, will suffice to convince us that the respective States were regarded as the essential, if not the sole guardians of the personal rights and liberties of the individual citizen. Mr. Justice Johnson, of the Supreme Court of the United States, in the case of *Martin vs. Hunter's lessees*, (1 *Wheaton* 362) says : " So firmly am I persuaded that the American people can no longer enjoy the blessings of a free government, whenever the State sovereignties shall be prostrated at the feet of the federal government, nor the proud consciousness of equality and security, any longer than the independence of judicial power shall be maintained

consecrated and intangible, that I could borrow the language of a celebrated orator, and exclaim, '*I rejoice that Virginia has resisted.*'" This is but one among a vast number of similar expressions; but I prefer to quote it, because it was uttered at an early period in our national history; because it was uttered in a judicial opinion, and in reference to a conflict of jurisdiction between the State and federal judiciary, which *did not "dissolve the Union."*

It is important to recur to the elementary principles on which our government is founded, more frequently, perhaps, than the apparently successful career of the Republic would naturally tend to move us. Nothing is more certain, than that " eternal vigilance is the price of liberty," and that " a frequent recurrence to fundamental principles" is the only means of sustaining the government in its original purity, and of preserving the original land-marks established by its framers. The subjection of judicial decisions to elementary criticism, will never be denounced as audacious, but by those who are content to follow precedent, even though precedent overleap the law, and become the mere pretext for usurpation. To such tests ought those who make decisions, as well as those upon whom they may operate, to be willing to subject them. It should be remembered, that " error does not become truth by being often repeated; nor does truth lose any of its force or beauty by being seldom promulgated." Nor does vice become virtue by persistence in its practice; nor bad government grow better by acquiescence in its evils; nor, where a people have adopted a written fundamental law, for the government alike of themselves and their rulers, does

JUNE TERM
1854.

In re
Sherman M
Booth.

the infraction of that law become healed by a denial of its occurrence.

The "rule of judicial order *stare decisis*," is appreciated to the largest measure of its value or importance, and will not be departed from on light or trivial grounds. When rights have become vested under judicial decisions, and especially when the policy of personal transactions has been shaped under a long course of judicial determinations, courts and judges will hesitate long before they will disturb the order and establishment of things and transactions predicated upon them. Distrusting suggestions, however plausible, and doubting conclusions, however forcibly urged, they will pursue the diverging and unwelcome pathway with faltering step, and anxious distrust, until they are lost in the mazes of uncertainty, on the one hand, or, on the other, they emerge into the plain highway of truth, which all may pursue with confidence and safety. But to say that such decisions preclude investigation or review, is to say that error may be made perpetual, and that the judicial department is an impregnable fortress, which no force of reason may approach, and no power of truth may assail. Such a rule would have driven from the bench of England one of the brightest luminaries of legal science, or would have imposed restrictions upon a genius which rescued the common law from the manacles of barbarism, and gave it a vitality equal to the progress of the nation upon whom it operated, and a power adequate to its own regeneration.

I am willing that the decisions of the Supreme Court of the United States, in every case determined by them, within the scope of their jurisdiction, should

be regarded as full and binding authority, as the law of the particular case so determined. But when it is strenuously contended, that I am compelled to adopt their interpretation of the Constitution and laws of the United States, and of their own powers, and the powers of Congress, without thought or inquiry—to take "*what is written is written*" as the end of the law, simply because it *is* written—that my own conscience and oath must be tamely subjected to the prescriptions of another tribunal, governed by the same laws and bound by the same oath—notwithstanding the high respect, approaching even to veneration, which I have for that high tribunal—I must be permitted to say, that no man or body of men is made by the Constitution the keeper of my conscience, nor does it impose upon any man or body of men the fulfillment of my official oath and obligations, or the power of releasing me therefrom. When duty and obligation require a steady and undeviating adherence to authority and precedent, no one will be more firm and anxious in insisting upon such adherence. But when the like duty and obligation require a departure from such precedent and authority, in obedience to a paramount law—the *fundamental law*, to which each and all are equally bound—I hope to be found just as firm in my adherence to the latter.

Perhaps it would not, under other circumstances, be required to reply to suggestions which counsel have deemed worthy of energetic expression; but considering the tone and manner in which they have been urged, it may not be unimportant to notice one, and perhaps others, as they may incidentally occur in the discussion of the principles which have been brought to bear upon the consideration of this case.

The counsel opposed to the application of the petitioner have thought proper to admonish this court of "its duty in troubled times," "and to teach faction that it has no judicial sanctuary." If, by this, it was intended to intimate that the power or tendency of faction might become the rule of its action, or should be considered in its judgment, instead of the law as it is, he ought to have reflected longer, and to have considered more maturely, whether the bench or the bar have so far forgotten their allegiance to the law, as to pursue the devious and turbulent pathway indicated by the suggestion. The history of the profession does not warrant it. The positions assumed by the Justice on the primary meeting do not justify it.

We know no party or faction. We desire to know none. The law, and the law only, and its due administration, is the object of our solicitude. Our aim is, to adjudicate upon cases, not parties; to apply the law as it is, not as we may think it ought to have been; to construe it as the properly constituted law-makers have given it to us; not as from their acknowledged wisdom we may suppose they ought to have framed it.

Nor, as has been suggested, in construing and applying the Constitution, "and the laws made in pursuance thereof," ought our reason and judgment to be thwarted by the possibility of conflict with other tribunals. If the laws made "in pursuance" of the Constitution *are* so imperfect that their due administration *necessarily* leads to collision, the remedy must be sought within the scope of the legislative department, or, by the primary action of the people, within their scope, by an amendment to the Constitution itself. This court has no power to remedy the defect.

It is properly restricted to the interpretation and ad-June Term 1854.
ministration of the laws as it finds them, and must so
administer them, or become faithless to its high and In re Sherman M Booth.
solemn functions and obligations.

But, as I said on a former occasion, I apprehend
none of these dangers. The line of demarkation is
not very dim ; and a just regard to the appropriate
attributes and powers of the State and Federal sov-
ereignties, on the part of the functionaries of each, is
the safeguard which the Constitution has itself provi-
ded against all attacks ; which has hitherto proved
adequate to every emergency, and which was deemed
by its framers far safer and wiser, than to provide one
sole, exclusive and ultimate umpire in either, which
might at its option absorb the powers and sover-
eignty of the other.

Indeed, it may well be affirmed, that this very di-
vision of sovereignty between the States and the fed-
eral government, without providing in either an ulti-
mate and exclusive judge of the respective powers of
each, but binding all alike to fidelity and obedience
to the prescriptions of the Constitution, is not the
least mark of the wisdom and foresight of those who
framed this complex and novel system. On the one
hand, if the sole power of determining upon the re-
spective powers of both governments, were confided
to the general government, it might lead to encroach-
ment upon, and ultimate extinguishment of the State
sovereignties : on the other, were it confided to the
States, the powers delegated to the federal govern-
ment might, one by one, be impaired, or swept away,
until at length it would be left powerless to accom-
plish the objects of its creation. But by prescribing
definitively the powers delegated to the general gov-

JUNE TERM 1854.

In re Sherman M Booth. ernment, by specific grant, on the one hand, and, on the other, by declaring in their fundamental law, that the powers and attributes of sovereignty not granted or relinquished, were reserved to the States and to the people, the federal government was ordained to move on within its own sphere, distinctly prescribed by its charter, and the States were left in the full enjoyment and exercise of the powers of complete sovereignty with which they had not parted—each operating as a check upon the other—neither inferior, but both supreme within their appropriate sphere— each quietly and almost imperceptibly repulsing the other, whenever the prescribed line should be over-stepped—each, by the necessary operation of its own functions, constantly admonishing the other of its approach to the line of demarkation, and, in its turn, being admonished of its own advance by the proximity of the other. Occasional conflict would sharpen investigation, whet official conscience, and thus lead to a correct understanding of the true boundary of jurisdiction; and fidelity to the great, fundamental and paramount law, to which the officers of each sovereignty are equally bound, would restrain both and all within their true and proper limits.

Such was the theory of the framers of the Constitution of the United States, concerning its practical working upon a free and intelligent people, already thoroughly schooled and disciplined in the principles and practice of self-government; and time and experience have fully justified their opinions and their faith.

The course of the argument of counsel upon the review of the positions assumed by the justice of this court to whom the original application of the peti-

tioner was made, (without referring, or attempting to refer specifically to the several objections taken to those positions,) makes it proper for me to refer briefly, and in very general terms, to some of the propositions advanced: like, that this court is bound, absolutely, by adjudications in analagous cases upon an analagous statute, by the decisions of the Supreme Court of the United States; that to the decisions of that court we are bound to yield, as to the decisions of a conceded appellate tribunal, with a " dignified judicial subordination."

I cannot yield my assent to the proposition. I do not so understand the relations of the respective courts. Especially, were the doctrine admitted in general, without danger or detriment, it would be fatal to recognize it in a case like this, involving the personal liberty of the citizen brought under examination through the instrumentality of the writ of Habeas Corpus.

I cannot, here, go over and attempt to sustain those positions first assumed. They are assailed by assumed *authority,* and by such *authority* only. Let authority have its just weight, on the one hand, and reason and history, on the other. But, as admonished by the Father of our country, familiar with the difficulties and obstacles which interposed to the formation of our national government, to recur frequently to elementary principles, it may not be improper, in recurrence to those fundamental principles of our government, to refer to what would seem an obvious and primary principle, by which the federal compact is to be interpreted, and for this purpose to look to the origin as well as the consummation of the system of

June Term 1854.

In re Sherman M Booth.

government established thereby, viz: the *source* of federal power, and the *extent* of the power derived.

The Constitution of the United States is, in its more essential and fundamental character, a *tri-partite* instrument. The parties to it are: THE STATES, THE PEOPLE, and THE UNITED STATES. The latter is, indeed, a resulting party, brought into existence by it, but when thus created, bound in all respects by its provisions. It is practically represented by its several departments, deriving their powers directly and severally through its respective grants. It is derivative, not original. Previous to the operative vitality of the Constitution, this third party to the instrument was non-existent, and of course powerless. The other two parties, the States and the People, were pre-existent, endowed with all the essential elements of sovereignty.

One great and fundamental mistake has been made in respect to the second party to the federal Constitution, viz: the People. This party, here spoken of, cannot be considered as the people inhabiting the whole territory embraced within the boundaries of the original thirteen States, as operating in mass, as one undivided and indivisible community. Previous to the formation of the government of the United States, there was no such political existence ; and of course, there being no such government, there could be no people of such government, or political division or organization. It is unnecessary, in this connexion, to refer to the confederation of the States, because that did not, in fact, constitute a government; nor will any one pretend that the people of the confederated States created the present federal government

in their capacity of a primary and ultimate source of political power, operating to institute a new and original government; because, to have done this, they must have necessarily first dissolved the State governments under which they were then living and acting, and absolved themselves from allegiance thereto. They did no such thing. The "people" mentioned in the preamble to the Constitution, and often referred to in judicial discussions, must, it seems to me, necessarily mean the people of the United States; that is, the people of the several States united; so many uniting as were deemed a sufficient number to warrant the institution of the new government, and render safe the delegation of certain powers before possessed by the respective States. The State governments pre-existed. If a portion of the citizens of a State had assembled to divest the State of an attribute of its sovereignty, without the assent of the State, it would have been treason, or revolution. If the people of the whole territory of the thirteen States had combined to divest the respective States of any of their proper attributes of sovereignty, without the assent of the States, it would have been closely allied to treason or conquest. But it was neither the one nor the other. The people referred to, must be intended to mean the people of the respective States, operating legitimately through their properly constituted authorities, in conformity with their legally established modes of procedure. As the people of the respective States, did they adopt the Constitution. By the *authority* of the STATES were the people called upon to adopt or reject the Constitution. By the people of the respective STATES was it adopted

JUNE TERM
1854.

In re
Sherman M
Booth. and when ratified by nine STATES, *Const. U. S. Art.* 7, (not a majority of the people of the Union to be formed,) was it to become operative. The States, as such, were distinctly recognized through every stage of progress, from the inception to the consummation of the plan of Union; and through the State organizations only could the first step be taken, and through those organizations only can the people of the Union now impress their will upon the measures or action of the government. Indeed, the federal Constitution provides no mode by which, in any case, can the people of the Union affect the federal government, but through the State organizations, and by the instrumentalities furnished by the governments of the respective States.

The States, therefore, as pre-existing sovereignties, are clearly parties to the federal compact, and, together with their respective people, were the creators of the third party to the compact, viz: THE UNITED STATES.

Nor was the Constitution of the United States submitted to the whole people of the thirteen States for adoption, but to the people of each State, represented in convention called for that purpose, by the authority of each State. On the question of its adoption or rejection, the people of each State, whether many or few, had an equal voice. They spoke on that question for their *State*, and the small States had an equal voice with the large.

Nor was the Constitution to become operative when a majority of the whole people of the proposed Union should ratify it, but when ratified by the conventions of nine *States*, and then only upon the States,

and the people of the States, so ratifying it. It had
no operation upon the States or people of the States
which did not ratify it.

The States derive not one single attribute of power or sovereignty from the Constitution of the United States. On their separation from Great Britain, they were each sovereign and independent; as completely so as the government from which they had revolted. They retain all the attributes of sovereignty which they have not delegated or relinquished. Nor does the Constitution address itself, in a single instance, to the people of the whole Union, as one indivisible community, but always to the people, or to the constituted authorities of the respective States. But the new entity brought into existence by the Constitution, does derive every jot and tittle of its power from that instrument. Without it, the States existed and performed all the functions of government. Without it, the federal government had not a shadow of existence. If that instrument ceased to operate the States would move on, performing their present functions, and probably resuming the powers before delegated; but the government of the Union would cease altogether.

I make these remarks, because persons in their zeal for federal supremacy seem to have lost sight of the true relations subsisting between the confederacy and its members. The rights and sovereignty of the latter would seem to be sacrificed to the exaltation and glory of the former. But returning to elementary principles, it will not be difficult to determine the just rights and limitations of both.

These remarks are made also for the purpose of exhibiting more clearly, principles of interpretation

which are to guide us in the construction of the Constitution and laws of Congress, whenever they involve a question of the relative rights and powers of the State and federal government, viz: that the State governments are primary and original; the federal government is derivative; the former having the rightful enjoyment of all powers inherent in a sovereignty which they have not relinquished; the latter rightfully exercising only those powers which were delegated.

Test the third clause of the second section of the fourth article of the Constitution by this rule: " No person held to service or labor in one State under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor; but shall be delivered up on claim of the party to whom such service or labor may be due." What power or authority did the States relinquish by this clause? At most, the right, and power, if you will, to enact any law or regulation by which such escaping fugitive shall be discharged from such service or labor. They also covenanted that the fugitive should be delivered up. But did they delegate to the federal government the right to enter their territory and seize him? Did they authorise that government to organize a police establishment, either permanently or temporarily, armed or unarmed, to invade their territory at will, in search of fugitives from labor, ranging throughout their whole extent, subject to no State law, but enjoying a defiant immunity from all State authority or process, while executing their mission? Did the States relinquish the right or power to prescribe the mode by which they would execute their own solemn com-

June Term 1854.

In re Sherman M Booth.

pact, in delivering up the fugitive? Did they, by assenting to this provision, suppose that they were yielding assent to the proposition now assumed as the basis, or at least the excuse, for federal interference, that they were incapable, from moral obliquity or otherwise, of executing the compact themselves? and therefore to preserve a remnant of fidelity, they would deposit this trust with the general government? The whole history of the clause in question precludes such hypothesis. The clear, indubitable construction of the words precludes it. A just con ception of the relative powers of the two govern ments, before stated, precludes it. Every just regard to dignity and self respect on the part of the States forbids it. Every sentiment of delicacy, not to say justice, on the part of the national functionaries should revolt at it. But the contrary is the fact, as asserted, I would, if I could say, implied, by the tenor of the argument; and these assumptions, so derogatory to the good faith of the States, so repugnant to the theory of our system of government, so irreconcilable with the principles of the whole structure, prostrat. ing the creators at the feet of the creature; disrobing the States, the sources of power, of almost every characteristic of integrity and virtue, and exhibiting the federal government as the only safe depository of those attributes; are not only made the founda. tion of legal argument, but they claim to be based upon judicial authority, absolutely controlling all official duty, requiring absolute and unqualified submission on the part of the States whose patriotism and good faith are thus impugned, and demanding " *a dignified judicial subordination*" on the part of the State courts, in order to " maintain the rule of judi-

cial order *stare decisis*" as established in the case of *Prigg vs. Pennsylvania.*" 16 *Peters' Rep.* 520.

Nor are these assumptions unsupported by the opinion of the court in that case, to which obedience is invoked. On the contrary, they include and form the very groundwork of the decision, as a few extracts from the opinions of the judges will show. Mr. Justice McLean says, " If the effect of it" (the clause in question) " depended in any degree upon the con struction of a State, by legislation *or otherwise*, its spirit if not its letter would be disregarded." (16 *Pet. Rep.* 622.) Not mere waywardness to the State legislatures, is here imputed, but contempt of constitutional obligation ; imputed, not only to the legislatures, but to the courts likewise. Be the imputation what it may, the argument is, that because the State functionaries are unfaithful to their constitutional duties, therefore the federal officers must take upon themselves their performance.

Again, page 661, Mr. Justice McLean says, " The States are inhibited from passing any law or regulation which shall discharge a fugitive slave from his master, and a positive duty is enjoined *on them* to deliver him up." He goes on to show the necessity of the provision, and then asks " Now by whom is this paramount law to be executed ? It is contended that the power rests with the States. The law was designed to protect the rights of the slave holders against the States opposed to their rights ; and yet, by this argument, the effective power is in the hands of those on whom it is to operate." " This would produce a strange anomaly in legislation. It would show an inexperience and folly in the venerable framers of the Constitution, from which, of all public bodies

that ever assembled, they were, perhaps, the most
exempt."

Was it folly in the framers of the Constitution to " enjoin a positive duty upon the States to deliver up the fugitive" and also to leave them the adequate power to fulfil that duty? This "paramount law" " enjoins a positive duty" upon the States, and yet in answer to the question " by whom it is to be executed?" it is asserted that it would show inexperience and folly to leave the party, upon whom a duty is enjoined, the power to perform it. Would it not rather show most consummate folly, to enjoin the performance of a positive duty upon the States, and at the same time deprive them of all power to execute it " by legislation or otherwise"? A " positive duty is enjoined" and yet it is consummate folly to leave " the effective power" to perform that duty in the hands of those upon whom it is enjoined! Is it supposable that the States would enjoin upon themselves a positive duty, and then voluntarily relinquish all power to perform it? The learned Judge is doubtless correct in saying that a positive duty is enjoined upon the States. Concede this, and it irresistibly follows that the power to perform it remains with the States. Mr. Justice McLean must either retract from his position that a duty is enjoined upon the States, or abandon his position that they have no power to execute it by legislation or otherwise. Both cannot stand. It is immaterial which is surrendered, one is worthless without the other, and the assertion of the one is fatal to the other. A " positive duty is enjoined upon the States to deliver up the fugitive," yet, if left to the States to provide for its performance, or directly perform it, " by legislation or otherwise," the letter

or spirit of the injunction would be disregarded.; but take away all power to execute the injunction and its fulfillment is secured !

Again, Mr. Justice Story who delivered the opinion of the court in the case above mentioned, (*Frigg vs. Penn.*) speaking of the clause in question, says : " He (the master) may not be able to lay his hands upon his slave. He may not be able to enforce his rights against persons *who either secrete, or conceal, or withold the slave.* He may be restricted by local legislation as to the mode of proofs of his ownership ; as to the courts in which he shall sue, and as to the actions which he may bring, or the process which he may use to compel the delivery of the slave. Nay, the local legislation may be utterly inadequate to furnish the appropriate redress, by authorizing no process in *rem,* or no specific mode of re-possessing the slave, leaving the owner at best, not that right which the Constitution designed to secure, *a specific delivery and re-possession of the slave,* but a mere remedy in damages ; and that perhaps against persons utterly insolvent or worthless."

" One State may require the owner to sue in one mode, another in a different mode. One State may make a statute of limitations as to the remedy in its own tribunals, short and summary ; another may prolong the period and yet restrict the proofs. Nay, *some States may utterly refuse to act upon the subject at all;* and others may refuse to open their courts to any remedies in *rem,* because they would interfere with their own domestic policy, institutions, habits, &c.

" The slave is not to be discharged from service or labor, in consequence of any State law or regulation. Now certainly without indulging in any nicety of criticism upon words, it may fairly and reasonably be

said, that any State law or State regulation which in-

terrupts, limits, delays, or postpones the right of the owner to the immediate possession of the slave, and the immediate command of his service and labor, operates *pro tanto* a discharge of the slave therefrom. The question can never be how much the slave is discharged from; but whether he is discharged from any, by the natural and necessary operation of State laws or State regulations. The question is not one of quantity or degree, but of withholding or controlling the incidents of a positive and absolute right."

Here is the same assumption of State infidelity which pervades the reasoning of the whole case. The States will not execute their own covenant, and therefore the federal government will execute it for them. Mr. Justice Wayne also, adopting the reasoning of the court in the opinion delivered by Judge Story, indeed I may say the language, for Judge Story uses almost precisely the same, says:

"If, then, in a controverted case, a person charged as a fugitive, shall be discharged under a remedy legislated by a State, to try the fact of his owing service or labor, is he not discharged under a law or regulation of a State? It is no answer to this question to say that the discharge was not made in virtue of any law discharging the fugitive from servitude, and that the discharge occurred only from the mode of trial to ascertain if he owed service and labor. For that is to assume that the provision only prevented discharges from being made by the States by enactment or law declaring that fugitive slaves might be discharged. The provision will not admit of such an interpretation."

"Would not the postponment of the trial of a

fugitive owing service or labor one month, be a loss to the owner of his service equivalent to a discharge for that time? And if a State can postpone by legislation, the trial for one month, may it not do so for a longer time? And whether it be for a longer or a shorter time, is it not a discharge from service for whatever time it may be? It is no answer to this argument to say that time is necessarily involved in the prosecution of all rights," &c.

In all of these passages, the necessity of federal legislation, and consequent judicial action, is urged, upon the assumption that the States will not, and therefore the federal government should, carry into effect this provision of the Constitution; imputing infidelity to the former, and claiming exclusive fidelity in this behalf, for the latter.

But I will not pursue this subject further. It is not pretended that there is any direct grant of power to the federal government in this clause, nor, that it is incidental to any other direct grant. But it is assumed, first, that a duty is required of the States to be performed; and because it is apprehended that the States will not perform it, therefore the federal government may, and even ought to perform it. Once admit this rule of interpretation, and the blindest cannot but perceive, that Congress may, as occasion shall seem to suggest, assume the entire duty of local legislation for the States, and that the whole power of internal police of the States may be usurped by the respective departments of the general government.

But I cannot pass over these two paragraphs without a word of comment upon the mode of reasoning here adopted, and the peculiar application of language, not indulged in, but rendered necessary to sus-

tain the premises assumed. The Constitution provides

that the fugitive from service or labor shall not be discharged from such service or labor by any law or regulation of the State into which he may have fled. The court say that the time necessarily occupied in adjudicating upon the claim of the alleged master, "is a discharge *pro tanto*." A discharge *pro tanto!* How so? What is a discharge? The slave owes service to his master for and during his life. A discharge from "*such*" service or labor is a release, an emancipation therefrom; not for a time, but for life. If I owe a note for one hundred dollars, and am exempted from the payment for a time after it becomes due, am I discharged from it? *pro tanto?* or in any sense? A part of it may be paid or otherwise satisfied, and thus discharged, but being once discharged, it is discharged forever. A postponement is not a discharge in any sense, and it is submitted that such a use of the word does violence to the language of which it is a part. To use the word in such a sense, is to confound all distinctions in the use of language. If this is to be considered a judicial interpretation of that word, what consequences would ensue? The giving time of payment would operate as a discharge of the debt. The law which prescribes the course of procedure to ascertain the validity of a claim, would operate as a discharge of the claim. If I replevy my horse, my title to him is *discharged* pending the litigation. Is such language, the English language? Is this such a judicial interpretation of the word "*discharge*" as to be binding upon the courts and people of the United States? If we agree to give further time for the payment of any obligation, we must not say, in consideration &c., the time of payment of the

within obligation is *extended* one month, but we must say, the payment is *discharged*, one month! If the executive wish to grant leave of absence to a subordinate officer, he must say he is *discharged* from service for the time. The slave has escaped from his master. The State in observance of its compact, provides for his arrest, and is proceeding to capture and deliver him up to his master, and this procedure is, according to such interpretation, discharging him! He was already beyond the power of the master, he had escaped, and the State has made regulations by which he shall be deprived of all the advantages he has gained by his escape; by which he is to be captured and delivered up; and this is called a "discharge!" The slave has escaped, he is seized and delivered up by the State, supposing that she is fulfilling her compact in that behalf. Not so, however, she is constantly discharging the fugitive, "*pro tanto*," and when the work is done, the escape is intercepted, the fugitive examined and delivered up to his master, the State finds out that she has not been delivering him up, but discharging him all the while, *pro tanto*, minute by minute, and when the work is done, and faithfully done, he is nevertheless not delivered up, but discharged!!! It is certainly consoling to the States, to be told, that to deliver up the fugitive is "a positive duty enjoined" upon them, that they have no power to do so, and that when they are delivering him up, they are nevertheless discharging him. If this be law, it is better, far better, to let the fugitive run, throw open the gates of our highways, and speed his progress, than to incur the guilt of *discharging* him, by seizing and delivering him up to the master on his proof of service due. Who does not see that this

would be a perversion of language? and yet it is pre-
cisely the use of the word, which becomes essential to
the positions assumed by the court, and which, it is
contended, is now consecrated and fixed, by the "rule
of judicial order, *stare decisis.*"

Let it not be said that this is a mere verbal criti-
cism. It is far from it. The use of the word in the
passages quoted was not merely accidental—a mis-
take, to which all are liable ; but it is studied, labored,
and argument is strained, in order to justify its pro-
priety. I desire to treat the opinions of the court in
the case in question, with entire respect ; but respect
is also due to our mother tongue. "Words are not
mere arbitrary signs of ideas," to be altered and
moulded at the pleasure or convenience of the writer.
They are "living powers," demanding a fealty that
admits of no evasion ; giving to language laws which
no judicial mandate can change, and no legislative
enactment can repeal ; ruling and guiding families,
circles, communities and nations. To pervert, or
change, or destroy the genuine meaning of a word,
may be to sap the very foundation of a nation's rights
and liberties ; it certainly is, to rob it of one of its
dearest rights, that of expressing its wants and its
woes, its affections and its joys, its duties and its
rights. I have a right. therefore, to protest against
this perversion of the use of this word "discharge" ;
for it is a part of my language—a sovereignty above
State and National, the sovereignty of thought and
affection.

Mr. Justice Wayne continues : " The question here
is not as to a time being more or less necessary, but
as to the right of a State, by regulations to try the
obligation of a fugitive to service or labor, to fix in

its discretion the time it may take." Here is the
same implied distrust of the States that is character-
istic of the reasoning of the whole case. But is it
not singular, that after deciding that the time neces-
sarily occupied in the trial of the "obligation of a fu-
gitive to labor or service," is a *discharge* from such
"obligation" *pro tanto*, and hence the States could
not regulate the trial, it never occurred to the court,
that Congress could no more " *discharge* " a slave from
such " obligation," even " *pro tanto*," than a State?
That to admit the premises and conclusions, and ap-
ply them in their full extent, would set the Union in
a blaze ?

It is not pleasant to refer to an opinion of the Su-
preme Court of the United States in this manner. I
would not have done so, if, from the character of the
reasoning, in this behalf any other mode could have
been perceived. Ordinarily, to quote the decisions
of that court accurately, is to pay them the highest
possible respect. If, in this instance, a fault is appa-
rent, it must be attributed to the fact, that the objects
of veneration sometimes, perhaps to indicate a deeper
devotion, interpose obstacles in the pathway of pil-
grims to their shrine.

The course of the argument has imposed upon me,
a necessity to examine further the case of *Prigg vs.
Pennsylvania.* It is cited as binding upon our con-
sciences. It is claimed that it is unbecoming in a
State court to question its authority, or to subject its
reasoning to elementary criticism. I deny its au-
thority. But if I did not, I should yet claim the
right to test its doctrines and reasoning by those rules
which are common to all human conclusions, and
which are the law of the human mind. I do not

June Term
1854.

In re
Sherman M
Booth.

mean to be understood, that a subordinate tribunal may lawfully resist the mandate of a superior, merely because the reasoning by which the decision of the latter is supported, may not exactly commend itself to the mind of the former. But there are *certain* rules common to every mind capable of reasoning, which are the law of its action. Common consent, or perhaps a more profound cause, has fixed to certain words a meaning, and to language certain forms, which become the law of the language, and which the decision of no tribunal can alter or subvert. So, in the formation of governments upon written constitutions, the intention and object are, to establish certain rules more or less specific, by which all its departments shall be governed, and which are above all rules prescribed by the tribunals organized by such government, from which they are not authorized to depart; and whenever they do depart therefrom, the rules prescribed by the fundamental law, must prevail instead of such decisions. This is not detracting from the weight or authority of judicial determinations. It is only saying that the authors of such determinations are subordinate to a superior law, the law of their own creation and endowment. Suppose the Supreme Court of the United States should direct a State Supreme Court to reverse its judgment in a case of which the former should assume appellate jurisdiction, and order and adjudge, in case the State court should neglect or refuse to do so, the judges thereof should respectively, be capitally executed. Would any executive officer of the federal government be found insane enough to execute such judgment? This is, indeed, an extreme case, but it illustrates the existence and vitality of constitutional law, above the rule of action resulting

from the position assumed in behalf of the decisions of the Supreme Court of the United States.

But to return to the decision in the case of *Prigg vs. Pennsylvania.* In the first place, it should be observed, that the decision of the case by the State Supreme Court was *pro forma* merely. The responsibility of deciding upon the matter by the latter court was avoided, (if my memory serves me, in conformity with a special act of the legislature of that State,) and by common consent, the United States Supreme Court was charged therewith. The question of jurisdiction was not raised at all. Jurisdiction was assumed, and the case proceeded, in order " to put to rest certain vexed and agitating questions ;" with what success, time and experience have unfortunately shown. If that court had no jurisdiction, that fact alone would strip its decision of all claim to authority. However patriotic the motives which induced the one court to concede, and the other to assume jurisdiction, it is not improper, perhaps, to remark, that one State has not the right to make a mere *pro forma* decision upon a given subject matter, for the purpose of conferring jurisdiction upon the Supreme Court of the United States, and by such process to bind every other State. If one State chooses voluntarily to relinquish its own sovereignty, it by no means follows that the other States have thereby relinquished theirs. If the consent of Pennsylvania *could* give jurisdiction in that case, hers was not the consent of all. If there was no jurisdiction, the decision is without legal effect for any purpose.

But, without at this time further questioning the jurisdiction of the court, and without admitting it, let us endeavor to discover the point or points in judg-

ment, necessarily involved for the purpose of deter mining the case. Pennsylvania in 1826 had, at the request of Maryland, passed an act to provide for the surrender of fugitives from labor or service, for the protection of free negroes, and to punish kidnapping. The plaintiff in error had seized and taken from the State of Pennsylvania, a negro woman and her children, one of whom was born in Pennsylvania more than a year after her escape thither, contrary, as was alleged, to the provisions of the act, and was indicted for kidnapping. He was tried. The jury found a special verdict, setting forth all the facts of the capture, &c., upon which the Court of Oyer and Terminer pronounced the defendant guilty. The case was removed to the Supreme Court of the State, where the judgment of the court below was affirmed *pro forma*, and thereupon a writ of error was issued by the Supreme Court of the United States to the Supreme Court of Pennsylvania, to remove the case to the former for review. This is a concise, not a full, but sufficiently full statement, to show upon what the Supreme Court of the United States had to adjudicate. The prisoner was under indictment for the violation of the statute of Pennsylvania. If that law was repugnant to the Constitution of the United States, or to the laws of the United States made in pursuance thereof, his conviction was wrong; otherwise it was valid, and sentence should have followed. What, then, was the question before the court necessary to be decided? Not, whether Congress had exclusive power to legislate upon the subject of fugitive slaves; not whether the States had concurrent power with Congress; but simply, was the law of Pennsyl-

June Term 1854.

In re Sherman M Booth.

vania repugnant to the Constitution of the United States, or to any law made in pursuance thereof?

It is admitted that the States can pass no law or regulation by which the fugitive from service or labor may be discharged therefrom. It is further admitted, that a duty is enjoined upon the States to deliver him up, on claim of the person to whom such service or labor is due. This covenant or compact has the force of constitutional law, and no State law repugnant to its provisions can be valid, but every such law is void. The simple question in the case referred to, was,—did the law of Pennsylvania contravene that provision of the Constitution? The law of Pennsylvania under which the prisoner was indicted, was the subject matter of inquiry. Its conformity with, or repugnance to, the constitutional provision, was necessary to be decided; nothing more. Admitting, for the sake of the argument, that the Supreme Court of the United States had the power to say to the State of Pennsylvania, that this law of hers was repugnant to the constitutional provision in question, it was not necessary to declare that she had no right to legislate at all in reference to that subject; nor to declare that the federal government had the sole and exclusive power of executing the provision; nor to declare that Congress had any such power of legislation, if the statute of Pennsylvania was repugnant to the provisions of the Constitution. The case in question, therefore, can only be authority, if authority at all, in relation to the particular point in judgment, viz: the constitutionality of the statute under which the prisoner was indicted. Argument may have taken a wider range; the course of discus-

June Term
1854.

In re
Sherman M
Booth.

sion may have had a wider scope, in illustration of the decision in the written opinions; but these were *obiter dicta* merely, and not binding at all. It may have been *res adjudicanda* whether the legislation of Pennsylvania in that behalf was forbidden by the Constitution, but not whether *any* legislation by the State *could be* constitutional; whether the State had legislated in a manner forbidden by the Constitution, but not whether she had power to legislate at all. These, and other questions nearly allied, were not necessary to the decision of the case, and the only point judicially determined was, that the statute of Pennsylvania, under which the plaintiff in error was indicted, was in conflict with the clause of the Constitution of the United States respecting fugitives from labor; and that simple point in no wise affects the questions involved in this case. It is indeed true that other points were discussed, and, by a majority of the court, attempted to be decided and "put forever at rest"; and it is equally true, that the minority positively protested against such *obiter dicta*, or earnestly dissented from the conclusions to which the majority had arrived.

The majority of the court decided that the 3d clause of the 2d section of the 4th article of the Constitution gave the owner of a fugitive slave the right to seize him, in any State in the Union, without process, and take him back to the State from which he escaped, and that the law of Pennsylvania which interfered with such right was repugnant to the clause itself, and therefore void. This was the point in judgment. This was the legal scope of the decision, and no more. And it is cheerfully admitted that any court, State or National, having jurisdiction of the subject matter and the

JUNE TERM
1854.

In re
Sherman M
Booth. parties, when the case requires it, is bound to declare any State or federal statute, which is in conflict with that clause of the Constitution, null and void. But it is not admitted that the doctrine of the case, as attempted to be established, is the true doctrine, or that it is at all compatible with the police power of the States.

But we will take the case as the majority have presented it, comparing occasionally the opinions delivered, consentient as well as dissentient, with each other, and with those rules of interpretation of the Constitution, which the Supreme Court of the United States has itself long since established, and which have been adopted also, with few exceptions, by the courts of the respective States.

The first observation which forces itself upon the mind, upon an examination of the case, is, that all the rules of construction theretofore established for the guide of the federal as well as State courts, in the interpretation of the Constitution of the United States, are utterly repudiated.

Among the rules of interpretation considered to be firmly established, which particularly concern the matter in hand, is the one laid down in 1 *Story's Commentaries*, 409–410. It is as follows: " A rule of equal importance is, *not to enlarge the construction of a given power beyond the fair scope of its terms, merely because the restriction is inconvenient, impolitic, or even mischievous.*" Yet the whole tenor and force of the argument in behalf of the assumption of federal authority for the execution of the compact in question, rests solely upon the inconvenience of State action, or the mischief resulting from the omission or refusal of the States to act. What is the "*fair scope of the terms*"

of the clause? It is submitted that it is clear, definite,
incapable of enlargement or restriction. The States have agreed that escaping slaves shall not be discharg-
ed from service or labor by the operation of their own laws, but that when claimed within their territory, and the claim established, shall be delivered up. This is the extent of the obligation. Is it not to enlarge the scope of its terms, to hold, that the States have relinquished all power to provide the means and mode of performing this duty?—that they have thrownopen their territories to incursion by fugitive hunters, and relinquished all power to protect their own people from false charges of escape, or of the obligation of service?—or from assault and outrage during the search? To hold that the mere covenant not to discharge, and to deliver up on claim, is a grant of power to the federal government to invade their territory and seize— when not one word of grant is found among the terms used, or necessarily implied? And do not the passages heretofore quoted conclusively show, that the power of Congress is deduced solely from the supposition that the clause in question would not probably be *conveniently* and *satisfactorily* executed without such assumption?

Again, the " fair scope of the terms" of this clause of the Constitution has been enlarged in violation of this rule, in assuming that it conferred upon the slave owner a constitutional right to have his slave restored to him in the State from which he fled. But it is obvious from reading the clause, that it contains no covenant or guaranty to return the fugitive, but only to deliver him up in the State to which he may have fled and in which he may be found; not to return him to the State from which he may have fled. The Supreme

June Term 1854.

In re Sherman M Booth. Court of the United States say, " that the object of this clause was to secure to the citizens of the slave-holding States the *complete* right and title of owner ship in their slaves, as *property*, in every State in the Union into which they might escape from the State where they were held to service or labor." It is respectfully submitted, that such was not the object of the clause, but far from it. It was not the object of the clause to legalize slavery in every State of the Union. Such is not now the legal effect of the provision. To give it such a construction would be enlarging the construction beyond the " fair scope of its terms."

The court say, " The object of this clause was, to secure to the citizens of the slaveholding States the *complete* right and title of ownership in their slaves, as *property*, in every State of the Union into which they might escape from servitude." "Its true design was to guard against the doctrines and principles prevalent in the non-slaveholding States, by preventing them from intermeddling with, or obstructing or abolishing the rights of the owners of slaves."

By what rule of interpretation such a construction can be placed upon the words contained in this clause, it is difficult to conceive. The *full* recognition of the right of property in the slave in every State in the Union ! The complete right and title of ownership in their slaves *as property!* It is submitted, that the recognition of the rights of the master enjoined by the clause is : (1) so far as not to discharge the fugitive from the labor or service which may be due, claimed and established ; and (2) to deliver him up on claim of the person to whom such labor or service is due, when claimed by him, and such claim is le-

gally established. That is all. Such is the bond; no more, no less. The seal may bind, but it cannot enlarge the scope of the bond. The *full* recognition of the rights of the owner in the slave, "as property," and not to obstruct those rights, would greatly enlarge the scope of this provision. The essential rights of the owner of property are, to sell or exchange it; also to use, enjoy, and control it absolutely, without hindrance or molestation. By this construction of the court, therefore, the owner of the fugitive may not only seize him in any State, but he may sell him, at auction or otherwise; he may hire him out to service for any term; he may command his immediate, as well as his prospective services, and lash him into obedience, and none of these rights may be obstructed or "intermeddled" with. Such a construction, if acquiesced in, would open up a market in every free State for fugitive slaves. Placards would be lawfully posted at every corner of the highway, and the service of the slave proposed as compensation or reward for his capture; and such a construction would arm every slave hunter with a lash, to scourge the fugitive into immediate service, or back to bondage; and no State law or authority could interpose to prevent such outrages, for all such would operate a "discharge *pro tanto.*"

It is submitted that this is going a *little* beyond the "fair scope" of the language of the Constitution. Its fair scope and true intent do not require of the free States any recognition of the right of the owner of the fugitive *in* him as *property.* That was never required of them, and would have been scouted had it been proposed. The clause simply requires that the States into which the fugitive shall escape shall

not discharge him from service, but deliver him up. He is recognized simply as a *person* owing service, not as a *chattel*, or as any species of property to be sold or bartered. In Virginia he may be, indeed, a *chattel;* but in Wisconsin he is a MAN. The laws of Virginia make him a chattel *there;* but the Constitution of the United States and the laws of Wisconsin regard him as a *person* here. Under the Constitution, the fugitive leaves the attribute of the chattel behind him in the State from which he flees, and goes forth as a PERSON. The law which makes him property in Virginia, does not go with him beyond the limits of that State. On his escape from such limits he ceases to be property, but is a *person* liable to be reclaimed. The *person* may escape, but the *property* cannot. The States are no more bound to recognize the fugitive slave as property, than a fugitive apprentice as property. The *relation* of master and servant is recognized so far, and so far only, as the obligation of service is implied from such relation. Even such obligation is not recognized as full, complete, present and operative, but as attaching to that relation in *another State*. So much of the law of the State from which he fled, as required of him *service* to his master *there*, is to be regarded, and from *that* obligation of service, imposed by *that* law, the State may not discharge him. The law of Virginia which requires of the slave service to his master, is recognized as the law *there*, not *here*. We may not discharge a fugitive from the service which, by law, he owes in Virginia. But by that law he owes no service *here*. The master may capture him in Wisconsin. We must deliver him up to his master, on the establishment of his claim ; but his master has no right to

command his *service* in Wisconsin. He must not
beat him. He may take him back to Virginia, but
he cannot command his service here. When he gets
to Virginia he will owe service by the law of that
State, but not till then. By the law of that State he
owes the service, and by that law only. That is the
law of Virginia, but not the law of Wisconsin. If
the master demand service here of his fugitive, and
beat him for disobedience, he is punishable by our
laws. Nor could the master, having captured the fu-
gitive in this State, sell or hire him to another. He
has just the control over him requisite to his extradi-
tion, and no more. He may relinquish that right,
and so emancipate him; for such relinquishment
would operate emancipation; but he cannot sell and
transfer his right of extradition to another. He may
employ, *perhaps*, an agent for that purpose; though,
strictly construed, the clause might be held to require
the claim to be made by the owner *in person*, to
whom the service is due, and to exclude the interven-
tion of an agent.*

Such, it seems to me, is the plain meaning of the
clause in question. I cannot conceive of any other.
And yet, in the same case (*Prigg vs. Penn.*) the court
say, "the clause contains a positive and unqualified
right of the owner in the slave as property, unaffected
by any State law or regulation whatsoever, because

---

* There would be good reason for holding that this claim must be made in per-
son, and not by an agent. The owner, on seeing his fugitive, who had served
him long and faithfully, might relent of his purpose of reducing him again to
bondage. The agent would be bound by instructions, and his heart closed
against the suggestions of sympathy or justice. There would be a propriety
therefore in requiring that the claim to an escaped fugitive should always be
made by the owner in person.

there is no qualification or restriction of it, to be found therein, and we have no right to insert any which is not expressed, and cannot be fairly implied. Especially are we estopped from so doing when the clause puts the right to service or labor upon the same ground and *to the same extent* in every other State, as in the State from which the slave escaped, and in which he was held to the service or labor. If this be so, then all the incidents to that right attach also."

Now one incident to that right in the State from which the slave has fled, is, that the owner may transfer it to another, and therefore no State law or regulation can prevent the exercise of that right in a free State and to the same extent to which the owner is entitled in his own State. The slave code of every State in the Union is thus engrafted upon the laws of every free State, and the latter are prohibited from all legislation on the subject, while the power of legislation, to enlarge or modify this right is in the former. To the " *same extent* " as the right of the master in the slave is given by the local law of Arkansas, is he entitled to enjoy and exercise it in Wisconsin or Massachusetts! This is insisted upon over and over in the opinion of the court, and it is claimed that the State courts are bound by the decision. I cannot assent to the proposition.

Again, it is said that " the clause contains a positive and unqualified recognition of the right of the owner *in* the slave unaffected by any State law or regulation whatsoever, because there is no qualification or restriction of it to be found therein ; and we have no right to insert any which is not expressed or clearly implied."

The rule of construction laid down in numerous in-

stances, which need not to be here specified, is, that the federal government can exercise no power, except what is expressly granted, or what is necessary to the exercise of some express power. We do not require or need restrictive or negative expressions in the Constitution, applicable to federal power. On the contrary, what is not granted is reserved without words of restriction. It was not necessary to insert any restriction upon the rights of the slave owner in this clause, because he had, and could have no rights but such as were *expressly* recognized. Nor without some express grant could Congress exercise any in his behalf. It would have been a work of supererogation to use restrictive words ; nay more, it would have been a dangerous expedient, for then it would have been held, and with reason, that all rights and privileges were recognized that were not expressly enumerated among the reservations. As it is, the States, and people, (if it better suits,) have merely assented to the provision that the fugitive should not be discharged by their laws and regulations, but shall be delivered up. Not one word is uttered beyond. To hold that the States have no power or rights but such as are expressly reserved or fairly implied ; that restrictions and reservations must be expressed, on the part of the States, or otherwise to be presumed as delegated or relinquished, is to reverse all rules of construction heretofore established. It is a dangerous doctrine. It is repugnant to the express provisions of the tenth amendment of the Constitution itself, which declares the contrary. Is there anything so sacred in the cause of a slave captor as to require a reversal of all rules of interpretation to sustain it ? Why should this clause of the Constitution be construed according to rules, and upon prin-

ciples different from those to which every other part of that instrument is subjected ? Why should State sovereignty be degraded in behalf of the slave owner, when every other claimant would approach its tribunals with respect and awe ? The doctrine of the U. S. Court is, that because the clause does not restrict the claims of the owner, it therefore recognizes them to any extent allowed in a slave State; that because the States have agreed to recognize *certain* rights, or rather demands, of the slave owner, viz : that they will not discharge, by law or regulation, a fugitive, and will deliver him up on claim, therefore they admit his whole claim of property ; his absolute right to service in their own territory ; indeed, all the rights of property and its incidents, to the "same extent" that he may demand them in a slave State, by the laws thereof ; that because they did not restrict the right of the owner to sell the fugitive, or hire him to service, or lash him into obedience, therefore, inasmuch as he had those rights to that extent in the State from which the slave escaped, he must have them in the State into which he may have fled ! This is establishing the rule, that the States can exercise no powers which they did not reserve, instead of the acknowledged, the express, the constitutional rule, that th   powers not delegated are reserved. This is no unworthy criticism upon the language of the court. It is the doctrine of the opinion from the beginning to the end. It is the basis, the very ground-work of the decision. It is absolutely necessary to the conclusions of the court. To narrow the basis, would be to destroy the superstructure. Abridge the premises, and the conclusions scatter. Upon this ground it was absolutely necessary that the court should plant its decision. No other

would serve to sustain it. They did so. To have done less, would have been to have done the reverse.

It may then be asked, in all candor, if the Supreme Court of the United States, or any officer or person, can expect the courts of the States to adopt this decision as the law of the land? Do they require obedience to this rule of interpretation? If so, in obeying this, we violate all other rules of construction by them established. Fealty to the doctrines of this case, is treason to the law of all preceding cases.

It cannot be necessary to refer specifically to the repeated adjudications by which the Supreme Court of the United States have declared the rules of construction of the Constitution, viz: that the federal government is one of limited powers; of powers delegated, not inherent; that it can exercise no power unless expressly granted or necessarily implied; that the federal government was endowed with no power but such as is expressed or necessarily incident to the execution of some express power; that all powers not delegated, expressly or by implication, or necessarily incident to some express power, were reserved to the States and to the people;—they are known to every student of the Constitution. (See *Martin vs. Hunter's Lessees*, 1 *Wheat.* 326; *Story's Com.* § 1238 *et seq.*; 1 *Kent's Com.* 388, 390; *Gibbons vs. Ogden*, *Wheat.* 203; 4 *Wheat.* 122; 5 *Wheat.* 1; 2 *Dall.* 386; 2 *Wheat.* 259; 3 *Wash. C. C. Rep.* 316, 322; *and cases there cited.*) Yet the rule sought to be established by this decision is, that reservations and restrictions in behalf of the States are to be expressed, and not grants or relinquishments in behalf of the federal government; that in the absence of restriction, positive and unqualified right or power is to be inferred;

JUNE TERM
1854.

In re
Sherman M
Booth..
that because the States and the people thereof have parted with *some* of the attributes of their proper sovereignty, therefore, they have parted with all which they have not expressly reserved !

These are the grounds upon which the doctrine of *Prigg vs. Penn.* is based. They are not inferences or deductions from the doctrine, but premises without the recognition of which, not one step towards the conclusion can be taken.

But I ought not to dismiss this portion of the case without suggesting its dangerous tendency. If the free States are bound by this clause of the Constitution to recognize the full and complete rights in the owner of the fugitive slave, as *property*, to the "*same extent*" as they were recognized in the State from which he escaped, then it will soon be claimed that the free States may be made a highway for slaveholders traveling with their slaves ; a thoroughfare for internal slave traders, over which to transport their living chattels from State to State, and State sovereignty itself must succumb to the slaveholders' authority. I do not mean to say that the case of *Prigg vs. Penn.* has that extent; but that such is its tendency. Perhaps it was intended by the court to restrict the application of its doctrines to the case of slaves who had *escaped*. Its language, however, has a much wider scope. But conceding as I do the full effect of such limitation, and how easy will it be to construe an advantage taken of a voluntary bringing of the slave into a free State, into a technical escape; so to frame affidavits as to support a constructive escape, and thus to hang not only the liberty of the citizen or inhabitant, but also the sovereign authority of the State, upon the mere affidavit of a man who, for hire,

would engage in the service of recapturing fugitives,

thus invading the territories of freedom in search of recruits to fill the ranks of slavery.

Having declared the right of the slave owner to the extent before stated in the remarks of the court quoted, the court go on to say, " If indeed the Constitution guarantees the right, and if it requires the de livery upon the claim of the owner, (as cannot be well doubted) the natural inference certainly is, that the national government is clothed with the appropriate functions and authority to enforce it.

The simple answer to this is, that the Constitution does not guarantee the right. It *guarantees* no right. No power is granted in the Constitution to the federal government to enforce or guaranty any right in regard to fugitive slaves, or any other slaves. The Constitution expresses a simple inhibition on the one hand, and enjoins a simple duty on the other. The inhibition on the States, is, not to discharge the fugitive by any State law or regulation ; the duty enjoined upon the State is, to deliver him up on claim, &c. An inhibition upon the States is not a grant of power to the United States. A duty enjoined upon the States, cannot be construed into a grant of power to the United States, to do the same thing in case the States do not. The States are inhibited from passing any law impairing the obligation of contracts, but *because* the States are thus inhibited, it cannot be contended that the federal government may do so. So far from it, that an express power was invoked and incorporated in the instrument enabling Congress to provide for a uniform system of bankruptcy. The duty of electing senators is enjoined upon the State legislatures by the Constitution of the United States ;

but because this duty is enjoined by that instrument, will it be pretended that if the States do not perform it, the United States may? and thereby assume to the United States Senate the power to fill vacancies which may occur in that body? Yet this is the doctrine of the Supreme Court of the United States in the case of *Frigg vs. Pennsylvania.*

The court say, in continuation of the paragraph just quoted, in illustration and enforcement of their doctrine : " The fundamental principle, applicable to all cases of this sort, would seem to be, that where the end is required, the means are given ; and when the duty is enjoined, the ability to perform it is contemplated to exist on the part of the functionaries to whom it is entrusted. The clause is found in the national Constitution, and not in that of any State." Mr. Justice McLean, who concurred in the main opinion of the court, that the power of legislation was vested exclusively in Congress, and wrote a separate opinion to strengthen it, says that a positive duty is enjoined upon the States to deliver up the fugitive, and the court say that because the clause is found in the national Constitution and not in that of the States, the federal functionaries must perform it, and the State functionaries cannot ; still the duty is enjoined upon the States, and when the duty is enjoined, the ability is contemplated to exist on the part of the functionaries to whom it is entrusted; nevertheless, though entrusted to the State functionaries, and the ability to perform it contemplated to exist on their part, it does not exist at all, and the States and their functionaries have no authority in the premises. Such is *Prigg vs. Penn.*, decided *pro forma* in a State court, and jurisdiction assumed in the Supreme Court of the United

States, " to put these agitating questions forever to rest."

" The clause is found in the national Constitution, and not in that of any State. It does not point out any State functionaries, or any State action to carry its provisions into effect. The States cannot, therefore, be compelled to enforce them, and it might well be deemed an unconstitutional exercise of the power of interpretation to insist that the States are bound to provide means to carry into effect the duties of the national government, no where delegated or entrusted to them by the Constitution."

What inference can be legitimately drawn from the fact that the clause is found in the national Constitution, in favor of a grant of power to the federal government, it is difficult to perceive. Many, very many clauses are found there which confer no power, some which do, some which restrict, and some which inhibit its exercise. Because it is found there, and nowhere else, it does not follow that the national government shall enforce it. On the contrary, the acknowledged rule of interpretation is, that it cannot exercise any power but such as is expressly or impliedly delegated, and that where this is not the case, the power of execution is reserved to the States or to the people. If the clause does not point out any State functionaries, or any State action to carry its provisions into effect, neither does it point out any national functionaries, or any federal action for the same purpose ; hence, according to the rule of interpretation, before stated, if it did not point out national functionaries, or federal action, the same were reserved to the States and the people thereof. There would have been a manifest impropriety in attempting

JUNE TERM
1854.

In re
Sherman M
Booth.

to prescribe the mode and State functionaries by which this duty that the States voluntarily bound themselves to observe, should be executed. It would have been as gross an impeachment of their integrity and honor, as is the decision of the court in this case. It would have been treated as the unworthiness of the suggestion had merited. But if the clause had contemplated federal action, what would have been more appropriate, than to point out the mode by which it was to be exercised, or to designate the federal functionaries who were to execute it. Indeed, it is inconceivable, that the convention should have contemplated the execution of this clause by the federal government, and should have prescribed no mode of execution, nor even grant any power to prescribe one; especially, when just before they had perceived the necessity of such grant in regard to the faith and credit to be given to public records of the States, and made the grant accordingly.

The vice of this sort of reasoning on the part of the court, is, that it begs the very question which it assumes to prove. It is assumed, that upon the national government is imposed the duty of delivering up the fugitive; then, because the duty is imposed, the means of performing it necessarily exist. But the duty is not imposed upon that government; and the members of the court who concurred in the opinion were obliged to abandon this fundamental position, and admit that the duty is enjoined upon the States. Then, according to the majority opinion, "when a duty is enjoined, the ability to perform it is contemplated to exist," a majority of the judges will be found, upon analysis, holding that the duty and the power, both rest with the States. These are in-

consistencies which it is difficult to follow and obey,
even " to preserve the rule of judicial order *stare de-*
*cisis*," or "to maintain a dignified judicial subordina-
tion."

The very fact, therefore, that the clause does not
point out any federal functionaries, or any federal ac-
tion to carry its provisions into effect, is a conclusive
argument, that State functionaries, and State action,
are the only constitutional means of its execution ;
because all agencies, powers and processes not granted
to the federal government or some department there-
of, are reserved to the States and to the people. And
for the court to assume, that federal authority is to
be presumed in all cases when State functionaries are
not pointed out, is a gross usurpation, and a flagrant
violation of all settled rules of construction, and a
palpable violation of the express provisions of the
tenth amendment of the Constitution itself.

One more assumption on the part of the court in
favor of the exclusive power of legislation by Con-
gress, and I will dismiss this branch of the subject.
The question which seems to have agitated the minds
of the court was, not what is the fair construction of
the clause, and the obvious mode of deriving its bene
fits, but in what manner may it be possibly stretched
and distorted to serve the present ends, and to suit
the convenience of the slaveholding States. The rights,
interests, feelings, dignity, sovereignty, of the free
States are as nothing, while the mere pecuniary in-
terests of the slaveholder are everything. This is as
absolute an impeachment of the patriotism of the
South, as it is of the integrity and honor of the North.
It assumes that the former value the Union at the
price of an occasional runaway negro, and that the

latter are recreant to their own solemn engagements. That the one is demanding vastly more than she bargained for; that the other is withholding that which she stipulated to yield.

The court say (page 623), "In the next place, the nature of the provision and the objects to be attained by it, require that it should be controlled by one and the same will, and act uniformly by the same system of regulations throughout the Union." Strange, indeed! What is there in the case of a runaway slave so very peculiar, as to require him to be caught by one and the same system? What so peculiar in the master's claim as to require it to be tried by one and the same rule in every State? Is there anything so sacred in the relation of the master to his fugitive slave as to require the "policy, local convenience and local feelings" of every State to be subjected absolutely to its demands? The slave States did not ask this at the time of the framing and adoption of the Constitution. All they asked of the free States, was expressed by Messrs. Pinkney and Butler in the clause which they presented in the national convention. All they dreamed of asking was, that their fugitive slaves should not be discharged by operation of the emancipation laws of the free States, or those which were becoming, or about to become free; that instead of discharging and protecting them, they would deliver them up on claim of the rightful owner. They were perfectly willing that each State should do this in its own way. The right of the State to emancipate its slaves was acknowledged, and it was asked that this sovereign right should be restricted so far, and so far only, that its laws should not affect slaves escaping from other States, so as to discharge them from the service due

by the laws of the slave State, provided they were claimed by their owners, and that if claimed, and the claim established, the State should deliver them up. This was acceded to. It was never asked that there should be provided a uniform system of recapturing fugitives; that all of the States should submit to the same regulations, and be subjected to the same *modus operandi*. It was never asked that the fugitive should be returned to the master *in* the State from which he fled, but only that he should be delivered up. Is it any greater hardship for the slave owner to re-possess himself of his slave, in conformity with the laws of the State in which he may be found, than it is for the owner of any other species of property, who pursues it into another State? If my horse strays, or is stolen, and taken to another State, I must resort to the laws of the State in which he is found, to try my title to him. This is no hardship. Each State provides me a remedy, though all do not provide the same remedy. And if I am so unfortunate as to meet conflicting claims in a State through which I may pass, they must be determined according to the laws of the place where they are tried. The State is bound by the clause in question to provide an adequate remedy to deliver up the fugitive, according to its true intent and meaning. If it do this, it is all that can rightfully be demanded.

It is a poor, grumbling argument to say, that because I must submit to the regular forms of law to establish my rights when contested, that to do so, would cost more than my claim is worth. This is the common complaint in all conflicting claims, to settle which requires the intervention of judicial forms. "The law's delay" is an ancient subject of grumbling;

but it still remains, notwithstanding the remedial agencies proposed by Jack Cade at an early period, and by judicial argument in modern times.

But it is said, that a trial of the claim of the master, and an adjudication in his favor, would be no protection in another State through which he might have to pass on his way to his own domicil. Well, what of it? The clause does not require of the State delivering up, any such guaranty. Nor does it furnish any such guaranty from any source. If more had been deemed requisite, more should have been inserted in the clause. But it is submitted, that ample protection is afforded by another clause of the Constitution, and power is given by express grant to Congress, to make it effectual. It is found in the first section of the same article four. "Full faith and credit shall be given in each State to the public acts, records, and JUDICIAL PROCEEDINGS of every other State. And the Congress may by general laws prescribe the manner in which such acts, records and *judicial proceedings* shall be proved, AND THE EFFECT THEREOF." Here is full protection in every State. Give to your mode of re-possessing yourself of your fugitive, and establishing your claim to his service, the dignity of a judicial proceeding, and you are protected in every State of the Union through which you may pass.

Here, then, vanishes one of the most frightful of the arguments of inconvenience raised by the court on which to found an implied power. All the others of the kind vanish likewise upon slight inspection. With these vanish all, for there are none other.

And herein have the slaveholding States gained vastly by the federal compact. Before the adoption

of the Constitution, their fugitive slaves were subject

to the emancipation laws of other States, and were only delivered up, or suffered to be captured by comity. By this clause the free and emancipating States imposed an inhibition upon their sovereign power, which would preclude the discharge of a fugitive, by the operation of their laws, from the service which he owed by the law of another State from which he had fled, and a covenant on their part to deliver him up to his owner. This was a vast acquisition on the part of the slave States, and they might well be content therewith. Had the confederation continued they would have had no such compact in their favor. Had the confederation dissolved, and no Union been formed, the flying fugitive would have been beyond the reach of the master the moment he entered a free State. Had the Union been formed without this clause, they were as well off as before. It is therefore all gain on the side of the slave States It was conceded by the free States without an equivalent. It was not the result of compromise. It is an abuse of terms, and a perversion of the truth of history to call it so. There is not a scintilla of historic evidence that thi clause or its subject matter, was a consideration in settling what were called the compromises between the North and South. On the contrary it was deemed by the South as so much clear gain ; as a covenant, a constitutional compact by which the free and emancipating states had bound themselves to deliver up fugitives from service, on claim of the owner, upon the establishment of his claim, and had forever inhibited themselves from passing any laws by which such fugitives should become free. In that light it was viewed by the mem-

bers of the conventions of the Southern States called to pass upon the Constitution. So was it viewed and explained by Mr. Madison and Mr. Randolph in the convention of Virginia, by Mr. Iredell, of North Carolina; so in South Carolina, and, in every instance in which it was mentioned, either the language used, or the context, plainly shows, that the point gained was, that their fugitive slaves were excluded from the operation of the emancipation laws of the Northern States, and that this was so much clear gain.

This is the fair scope of words of the clause. With it the South were satisfied. They demanded no uniformity of remedy. They were willing to leave the mode of execution to the good faith of the States. Why then seek to enlarge the scope of the words? Why make a new bargain, because the old one may operate inconveniently? And well might the South, in view of the tendency of the local policy of the Northern States, be content to rest upon such a compact, without demanding a uniform remedy in every State. They might well leave to the Northern States the poor privilege of consulting their own local welfare, peace, feelings, aye, prejudices, if you will, as to the mode of delivering up the fugitive. Their own domestic peace might require a different process from what might be required elsewhere. The tone of public sentiment, the temper of the times, their contiguity or remoteness from slave territory, might render modifications, as to the remedy, essential to its due and peaceful execution in different States; and it mattered little what was the mode of execution, so that the remedy was adequate. It might well have been apprehended, that the States would never consent to have one or another mode forced upon them, however

repugnant to the feelings of their people, or however dangerous to the peace of the States, merely for the sake of uniformity! The Southern States asked no such thing. The Northern States conceded no such thing. As sovereigns they entered into the compact with sovereigns; as sovereigns will they execute it. Not a vestige, not an implication of power to execute it is conferred upon another. An intimation of the expediency of such a grant would have been deemed not only an insult to the States, but a deadly encroachment upon their sovereignty, and a complete usurpation of their powers of internal police. Had the Northern States imagined, that by assenting to this clause of the Constitution, they were thereby conferring upon the federal government the power to enter their territory in pursuit of a runaway negro, and to employ the whole military and naval force of the Union for that purpose, to subject their houses to search, and to override their own laws and municipal regulations, and that they were parting with all power to regulate the mode of procedure by which that clause was to be carried into effect; does any sane man believe that they would ever have assented to it?—or, if the Southern States had imagined such a construction would be put upon it, that they would ever have proposed it?

I had intended to compare the several opinions delivered in this case, and to show (which it would be easy to do) that there is scarcely a point attempted to be settled by the majority opinion, which is not left unsustained by a majority of the judges, in their separate opinions. Indeed, it is hardly possible to discover a single point on which a majority agree when they speak separately, except, perhaps,

the power of Congress to legislate, and even that is left doubtful. But these remarks have been already extended so far, that I am precluded from discussing the subject of that decision much further. It seems to me that it cannot deserve the claim to authority. set up for it.

If this case is authority at all, binding upon any court, it is only authority upon the point in judgment, and that point was, whether the act of Pennsylvania, under which the plaintiff in error, Prigg, was indicted and convicted, was unconstitutional. The court decided that it was repugnant to the clause which has been mentioned, inasmuch as by that clause, the master may seize his fugitive in any State, and remove him, by his own act, and without process, and convey him out of the State; and as the statute of Pennsylvania made such an act punishable as for kidnapping, it was repugnant to the clause in question, and therefore void. It is cheerfully admitted, that all laws enacted by a State, or by Congress, which contravene the provisions of that clause, are unconstitutional and void; and it is as much the duty of the State courts so to declare them, whether passed by the State or National legislature, as it is the duty of the United States courts; no more, no less; and the determination of the one according to its grade, is as much authority as the other.

This case ought not to be passed over without noticing one important fact established by the special verdict, and which seems to have been entirely overlooked in the opinion of the court. The negro woman, Margaret Morgan, escaped from the State of Maryland (where by the laws thereof she owed service, or, in other words, was a slave for life to one Margaret

Ashmun) in 1832. This Prigg was appointed agent
by the said Margaret Ashmun to "seize and arrest
the said Margaret Morgan as a fugitive from labor,
and to remove, take and carry her from this State
(Pennsylvania) into the State of Maryland, and there
to deliver her to the said Margaret Ashmun"; that
the said Prigg, instead of confining himself to the
terms of his power as agent or attorney, "did take,
remove and carry away the said negro woman Mar-
garet Morgan, AND HER CHILDREN, out of this State
(Penn.) into the State of Maryland, and did there de-
liver the said woman *and her children* into the custody
of the said Margaret Ashmun." And "*that one of
the said children so taken and removed and carried
away, was born in this State (Penn.)* MORE THAN ONE
YEAR AFTER *the said negro woman Margaret Morgan
had fled and escaped from the State of Maryland.*"

It is a little singular, that though Prigg had taken
and carried away this child, born in Pennsylvania
more than one year after the escape of the mother,
yet no mention whatever is made of the fate of that
child, except that it was delivered to Margaret Ash-
mun. But there is no concern for this child expressed
in the opinions of the court and judges. A child
born in a free State *more than one year after* the
mother had fled thither, could hardly have been re-
garded as "*an incident*" to the right of the owner
"*in*" the slave mother. Perhaps it was supposed
that "the *full* recognition of the rights of the owner
in the slave, as property, to the same extent, and with
all its incidents, as the same is recognized in the State
from which she fled," would embrace this child of
Pennsylvania within the comprehensive scope of the
principle sought to be established. It may be, and

indeed such is the force of the language of the court heretofore quoted from page 613, that the court held (if the fate of the child entered into its consideration at all) that, as by the law of Maryland the condition of the child follows that of the mother, so should that law pursue the escaping female, and attach to her offspring in any State in which they might be born, however remote from the period of escape. Such is the necessary result of the positions and arguments adopted in the case of *Prigg vs. Penn.* If the opinion decides anything, it decides this. The more charitable conclusion, however, is, that this *little humanity* perceptible in the record, was lost sight of in the endeavor, so happily achieved, " to put these agitating questions forever to rest."

The entire argument of the majority opinion in this case is based upon the assumption that a duty is imposed upon the federal government to deliver up the fugitive, and therefore Congress must have the sole power to legislate the mode of its performance. Other judges, who dissented from the doctrines of the opinion, and Mr. Justice McLean, who concurred in the main principle just mentioned, but who dissented upon other grounds, abundantly refute and subvert the assumption, and show, what indeed is palpable, that the duty is enjoined, not upon the federal, but upon the State governments; thus completely overthrowing the whole fabric of the decision, by subverting its foundation.

No duty is enjoined upon the federal government. The clause addresses itself to the States and contemplates State action. It imposes a restriction upon State legislation, inhibiting any law or regulation by which the fugitive shall be discharged; thus recogni-

zing the power of State legislation and its validity to
any extent, not within the express inhibition.

Much stress is laid upon the fact that at an early
day Congress assumed the power of legislation, in the
passage of the act of 1793, thus affording contempo-
raneous interpretation as an argument in favor of the
power of Congress to legislate upon the subject. But
the Supreme Court of the United States in this very
case, determine that act to be unconstitutional, inas-
much as it requires the action of State functionaries
to execute it. If unconstitutional in the mode of leg-
islation, it may be equally so in regard to the *rightful*
power of legislation. Indeed the very fact of the ap-
parent impossibility of the national legislature, to
provide for the execution of this clause of the Consti-
tution, without violating its other provisions, ought
to be sufficient to satisfy all, that the power rests with
the State and not with the national functionaries, and
that as the duty is enjoined upon the States, they
must necessarily have the power, and the exclusive
power to perform it. (See extract from the opinion
of Justice McLean before quoted.)

There are many other positions assumed, or re-
marks made in the *various* opinions in this case which
I would like to comment upon, but it is impossible
at this time. Enough has been said it is believed, to
render it apparent, that it is not, that it *cannot* be
authority for any court. Even did we admit that
the Supreme Court of the United States is an appel-
late tribunal to this court, we could not hold the doc-
trines and opinions of this case as binding upon our
consciences, or as controlling our action.

The decisions previous to the case of *Prigg vs.
Pennsylvania*, are admitted in almost all discussions

JUNE TERM 1854.

In re Sherman M Booth.

to be of little weight, either on account of the discrepancy of opinion among the members of the respective courts which have chanced to touch upon the question, or from the fact that the question has not been raised in the cases adjudicated. I do not refer to them specifically, deeming it of little importance to do so. Those who are curious upon the subject will be able to satisfy themselves of the correctness of this remark by referring to the several cases which have been cited in other parts of the record of this case. None of them seem to be relied upon, nor are indeed worthy to be considered as authority, inasmuch as the main questions involved are scarcely raised, much less, carefully considered.

The cases in which the questions here raised have been brought before the courts, *since* the decision of the case of *Prigg vs. Pennsylvania,* have been determined in accordance with the doctrines of the latter, in the main, without examination or discussion. There seems to have been a great reluctance on the part of the State courts to enter upon the discussion of the subject, and a willingness to forego investigation of the principles involved, and to rest quiescently upon such authority as that case furnished. The United States courts have seemed to be content with the effort then made, and I am not aware that that case has ever been seriously reviewed. However, in the case of *Moore vs. Illinois,* 5 *Howard,* 13, the doctrines of *Prigg vs. Pennsylvania* seemed to press too hard upon the court, and without formally overruling the main question, viz: that the States had no power to legislate upon the subject of fugitive slaves, the court virtually overthrow the fundamental principle there established; admit and decide that the States may

legislate a remedy in the very case contemplated by the second section of the fourth article of the Constitution, but refer it to their power of internal police. No person who will carefully examine the doctrines and argument in the case of *Prigg vs. Pennsylvania,* and compare them with the facts and opinion in the case of *Moore vs. Illinois,* can fail to observe that the latter is utterly irreconcilable with the former, and does virtually overrule it.

I am now done with my remarks upon this case, so often quoted, and in the argument at the bar so strenuously insisted upon as establishing a rule of judicial order and conduct—a rule which no lawyer or judge will ever esteem lightly—the rule " *stare decisis.*" It seemed to be due to this court and to myself that this case should be examined. I have tried to do so fairly and respectfully. Sometimes it has been difficult, on account of the peculiar mode of reasoning adopted, and the freedom of language, terms, and rules of construction indulged in, to maintain the solemn dignity which should be observed on approaching matters so grave, and opinions sanctioned by such eminent names. But these names are not to me the highest objects of reverence ; the sovereignty of my State is higher than either or all ; there is an authority above them all, that of the Constitution of the United States.

In an opinion like this, it would be out of place to attempt to show the baneful effects of that decision. But it would be easy to adduce facts without number, and dates unerring, indicating most unequivocally, that, if the annunciation of that decision was not the beginning of our troubles, it tended, and still does tend, greatly to enhance them. I speak not of its de-

sign. Doubtless it was patriotic and conscientious, viz: to declare the law as it was believed to be. But every day's experience ought to satisfy all, that the States never will quietly submit to be disrobed of their sovereignty ; submit to the humiliation of having the execution of this compact forced upon them, or rather taken out of their hands; by national functionaries; and that, too, on the avowed ground that they are so utterly wanting in integrity and good faith that it can be executed in no other way. On the contrary, if the federal government would abstain from interference, the States would adequately fulfill all their duties in the premises, and peace and order would be restored.

But they will never consent that a slave owner, his agent, or an officer of the United States, armed with process to arrest a fugitive from service, is clothed with entire immunity from State authority; to commit whatever crime or outrage against the laws of the State, that their own high prerogative writ of Habeas Corpus shall be annulled, their authority defied, their officers resisted, the process of their own courts contemned, their territory invaded by federal force, the houses of their citizens searched, the sanctuary of their homes invaded, their streets and public places made the scene of tumultuous and armed violence, and State sovereignty succumb, paralyzed and aghast, before the process of an officer unknown to the Constitution, and irresponsible to its sanctions. At least, such shall not become the degradation of Wisconsin, without meeting as stern remonstrance and resistance as I may be able to interpose, so long as her people impose upon me the duty of guarding their rights and liberties, and of maintaining the dignity and sovereignty of their State.